ROCK CREEK DITCH & FLUME CO., APPELLANT, v. MILLER ET AL., RESPONDENTS.

(No. 6,955.)

(Submitted October 18, 1932. Decided January 5, 1933.)

[17 Pac. (2d) 1074.]

250

*Messrs. Murphy & Whitlock* and *Mr. John E. Corett, Jr.,* for Appellant, submitted a brief; *Mr. Wm. L. Murphy* and *Mr. Corette* argued the cause orally.

252

*Mr. J. J. McDonald* and *Mr. W. E. Keeley*, for Respondents, submitted a brief and argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is an appeal by plaintiff from a judgment in favor of defendants. The plaintiff, a corporation, was organized principally to supply water to its stockholders who owned irrigable lands in the Trout Creek Valley in Granite county, but under its articles of incorporation it has ample power to appropriate, acquire, sell and otherwise dispose of water. Pursuant to its primary purpose, the plaintiff, in 1914, constructed a ditch, or canal, seven miles in length, running from the east fork of Rock Creek over the ridge which separates the Rock Creek and Trout Creek watersheds, into the Trout Creek basin, where plaintiff sold water conveyed by the canal to its stockholders for irrigation, among others the Messrs. Mungas, who owned section 12, T. 5 N., R. 15 W., upon which the canal terminates; water is there delivered to the Mungas ditches and used upon that section.

Wyman, or Pool, Creek has always been a natural stream, with well-defined banks, having its sources in section 7, T. 5 N., R. 14W., and in sections 1 and 12, T. 5 N., R. 15 W. This stream is tributary to Trout Creek for a short period during high water, but after that its waters, if not taken from the stream, sink and are lost.

In 1906 P. S. Carey appropriated 25 inches of the waters of Wyman Creek for irrigating his lands in section 8, adjoining section 7.

The court found the Millers, defendants, appropriated 120 inches of the waters of Wyman Creek as of date May 1, 1911, by means of a ditch tapping the stream in section 5, T. 5 N.,

R. 14 W., and running thence to their lands in section 32, T. 6 N., R. 14 W. This finding is attacked on several grounds, but none is tenable. That the Millers did dig their ditch and thereby appropriate water from Wyman Creek, which they used immediately upon their lands about the date fixed (the exact date being immaterial here), there can be no doubt; nor under the fact conditions is the amount fixed material to this decision.

In section 7 the principal feeder of Wyman Creek is a spring, which is a material factor in this controversy.

The Mungas people, in 1914, began irrigating their lands in section 12 with water from the Rock Creek canal. Two years later the flow of the above-mentioned spring began to increase materially. While there is considerable argument in the brief of counsel for the Millers against the assertion, we think it is reasonably certain, as plaintiff contends, that the increase resulted from the use of Rock Creek water employed in irrigating section 12. This increase came to the spring by underground seepage, percolation, none of it through a surface channel. The canal ends a mile from the spring, and there is not any ditch which brings Rock Creek water anywhere near the spring or Wyman Creek. If, as seems probable, water, originally diverted from Rock Creek, enters the spring, it does so after the Mungas people have purchased the use of it from plaintiff and have used it for the irrigation of section 12.

Doubtless there were other accessions to Wyman Creek from seepage; the evidence indicates that its sources of supply in sections 1 and 12 were also increased by irrigation upon section 12.

Neither the plaintiff nor any of its officers or stockholders have made, or attempted to make, any appropriation of the waters of Wyman Creek or its tributaries. John Hickey, a stockholder, is the owner of section 7, having acquired it in 1927, although beginning with 1925 he had possessed it under a lease for pasturage purposes. He purchased shares of stock in the corporation from George Mungas in November,

1926, and, while they were negotiating respecting the transfer of the stock, they discussed the feasibility of taking water out of Wyman Creek by means of a ditch which would cover a considerable portion of section 7. Hickey did not attempt to use any of the waters of Wyman Creek until 1928, when he, in co-operation with the Messrs. Mungas, constructed a ditch leading from the spring to his adjacent lands, by means of which he would have taken all its waters (although doubtless he would have respected the prior right of Carey, whose ditch diverts from Wyman Creek), if he had not been interfered with by the defendants Miller; they tore out his dam and prevented his use of the water, which occasioned this lawsuit.

Incidentally, it does not appear that any contract was made, or understanding had, between the plaintiff and Hickey respecting the construction of this ditch or the use of the water to be diverted thereby; what was done was the result of an understanding, or an arrangement, between Hickey and the Mungases, stockholders of the plaintiff.

Plaintiff's theory is that by bringing Rock Creek water into the Trout Creek watershed it has created a new source of supply therein; that the Rock Creek water, after its use by irrigation, by percolation has increased greatly the flow of the spring in section 7, and has otherwise increased the flow of Wyman Creek; that through its stockholder Hickey, who built a ditch on his land "at its instance," plaintiff "recaptured" this "excess" of water for the use and benefit of its stockholders. Plaintiff's counsel say: "It is the contention of the plaintiff that it at all times has been entitled to the use for sale to its customers and stockholders of all the water brought into the basin and that the same has never been the proper subject of appropriation by the defendants, since it has never constituted a part of the natural flow of any stream."

But plaintiff's principal premise is not sound. Without reference to the right of a land owner to control underground water upon his own land, when it joins a natural stream it

becomes a part of that stream and is *publici juris*. This comes down by gradations from the civil law doctrine of ''the negative community.''

The classification of running water with what has been called ''the negative community'' runs through both civil and common-law jurisprudence. In the Institutes of Justinian it is said: ''By natural law these things are common to all, viz.: air, running water, the sea, and as a consequence the shores of the sea.'' Pothier, the learned French jurist, wrote of the civil law doctrine: ''The first of mankind had in common all those things which God had given to the human race. This community was not a positive community of interest, like that which exists between several persons who have the ownership of a thing in which each has his particular portion. It is a community which those who have written on this subject have called a negative community, which resulted from the fact that those things which were common to all belonged no more to one than to the others.'' Pothier then lists as among those things belonging to the negative community the air, water which runs in the rivers, the sea and its shores, and animals *ferae naturae*. (1 Wiel on Water Rights, 3d ed., sec. 2.)

The Romans included running water in the term *''res communes.''* The civil law principle that running water is in the ''negative community'' passed into the common law. (Wiel, Id., sec. 3.) Blackstone said: ''For water is a movable, wandering thing, and must of necessity continue common by the law of nature.'' (Cooley's Blackstone, Book II, 18.)

Eventually the expression changed from ''things common'' to ''things public,'' but, so far as these terms concern the rights of private individuals, ''both are founded on the ancient view taken by the law that running water unrestrained in its natural course belongs to the 'negative community' and is nobody's property; its particles or aggregate drops, in specie as a substance, being outside the domain of what can constitute property; just as no one can be said to own the

air, the sea water, the rain or the clouds or the moon or the stars, or the pearl at the bottom of the sea, the wild animals in the forest, or the fish swimming in the running stream itself. Like all these things, running water in its native condition is a substance wandering at large, obeying its own will and ever changing its form and position, uncontrolled by man, and with them moved in 'the negative community,' whatever be the phrase adopted to express that idea.'' (1 Wiel on Water Rights, 3d ed., sec. 7.)

These historical sources were recognized by Mr. Justice Holloway in one of his finest opinions, *Mettler* v. *Ames Realty Co.*, 61 Mont. 152, 201 Pac. 702, 704, in which it is declared that the corpus of running water in a natural stream is not the subject of private ownership. ''Such water is classed with light and the air in the atmosphere. It is *publici juris* or belongs to the public. A usufructuary right or right to use it exists, and the corpus of any portion taken from the stream and reduced to possession is private property so long only as the possession continues. These principles were borrowed by the common law from the civil law and in turn were borrowed by the law of appropriation from the common law.''

The doctrine that an appropriator does not own the corpus of the water, but only its use, as stated in *Mettler* v. *Ames Realty Co.*, supra, has been announced by this court many times. In *Verwolf* v. *Low Line Irr. Co.*, 70 Mont. 570, 227 Pac. 68, 71, Mr. Justice Holloway, speaking of a company which had constructed a canal through which it conveyed water for sale and distribution, said: ''By its appropriations the company acquired merely the right to the use of the waters—not a title to the corpus of the waters (*Norman* v. *Corbley*, 32 Mont. 195, 79 Pac. 1059); and it conveyed to Verwolf the same character of right.''

Mr. Justice Matthews, speaking for the court in *Tucker* v. *Missoula Light & Ry. Co.*, 77 Mont. 91, 250 Pac. 11, 15, made this pertinent declaration: ''The so-called 'ownership' of water differs from that of personal property capable of cor-

:poreal possession. Neither the appropriator of water nor one to which a right is decreed owns the corpus of any part of the flow of the stream. He is entitled only to the beneficial use of the amount of water called for by his appropriation or decree when he has need therefor, and providing his distributing system has a sufficient capacity to carry such an amount of water. (*Creek* v. *Bozeman Water Works Co.*, 15 Mont. 121, 38 Pac. 459.)''

And in *Custer* v. *Missoula Public Service Co.*, 91 Mont. 136, 6 Pac. (2d) 131, 133, we said: "It is elementary that the appropriator of the water of a running stream does not own the corpus of the water; he owns only the right to use it. (*Allen* v. *Petrick*, 69 Mont. 373, 222 Pac. 451.)''

Mr. Wiel says: "When possession of the actual water or corpus has been relinquished or lost, by overflow or discharge after use, property in it ceases; the water becomes again nobody's property and re-enters the negative community, or 'belongs to the public,' just as it was before being taken into the ditch. * * * The specific water so discharged or escaped is abandoned; not an abandonment of a water right, but an abandonment of specific portions of water, viz., the very particles that are discharged or have escaped from control." (Wiel on Water Rights, 3d ed., sec. 37.)

"Waste water may have three meanings, as follows: First, ▇▇▇▇ water that is actually wasted or not needed by the claimant thereto; second, water which after it has served the purpose of the lawful claimant thereto, has been permitted to run to waste or to escape; and third, water which from unavoidable causes, escapes from the ditches, canals, or other works of the lawful claimants." (Kinney on Irrigation and Water Rights, 2d ed., sec. 332.)

"Percolating waters are those which ooze, seep, or filter, through the soil beneath the surface, without a defined channel, or in a course that is unknown and not discoverable from surface indications without excavation for that purpose." (*Clinchfield Coal Corp.* v. *Compton*, 148 Va. 437, 139 S. E.

308, 311, reported in 55 A. L. R. 1376. And see other definitions in the note on page 1388 of 55 A. L. R.)

In *Ryan* v. *Quinlan,* 45 Mont. 521, 124 Pac. 512, 515, Mr. Chief Justice Brantly, speaking for the court, said: "When water seeps into the earth, it mingles with the soil and remains suspended therein, or moves through it either by percolation, thus losing its identity as a flowing stream, or passes away by one or more defined channels. It has been settled by a long line of decisions that percolating water is not governed by the same rules that are applied to running streams. 'The secret, changeable, and uncontrollable character of underground water in its operations is so diverse and uncertain that we cannot well subject it to the regulations of law, nor build upon it a system of rules, as is done in the case of surface streams. Their nature is defined, and their progress over the surface may be seen and known and is uniform. They are not in the earth and a part of it, and no secret influences move them; but they assume a distinct character from that of the earth, and become subject to a certain law—the great law of gravitation.' "

Conceding that percolating waters are owned by and are subject to the control of the owner of the land (*Ryan* v. *Quinlan,* supra; *Spaulding* v. *Stone,* 46 Mont. 483, 129 Pac. 327, 329), when they escape and go into other land, or come into another's control, the title of the former owner thereto is gone. (See *Ohio Oil Co.* v. *State of Indiana,* 177 U. S. 190, 20 Sup. Ct. Rep. 576, 44 L. Ed. 729.)

Where vagrant, fugitive waters have reached a natural channel, and thus have lost "their original character as seepage, percolating, surface, or waste waters," they serve to constitute a part of the watercourse, and are subject to appropriation. (*Popham* v. *Holloron,* 84 Mont. 442, 275 Pac. 1099, 1102, and see *Hagerman Irr. Co.* v. *East Grand Plains Drainage Dist.,* 25 N. M. 649, 187 Pac. 555; *Eddy* v. *Simpson,* 3 Cal. 249, 58 Am. Dec. 408; 15 Morrison's Min. Rep. 175.)

One feature of the case of *Galiger* v. *McNulty,* 80 Mont. 339, 260 Pac. 401, 406, bears an analogy to this. There the waters

of Rams Horn Creek had been conducted across the ridge into Bivens Creek where they were used for placer mining, after which they were released. The owners of the rights to use the water for placer mining purposes assumed to sell them for irrigation. This court, speaking through Judge Poorman, said that after the owners of the mining rights had used the waters for placer mining purposes and the water had drained below their lands, their control over it ceased: "It had subserved the purpose of their appropriation, and, as it could not drain back into the stream from which it was taken, it became waste, fugitive, and vagrant water and subject to be treated as such, and the appropriators had no longer any jurisdiction over it or ownership in it. They did not own the corpus of the water; hence they had nothing to sell, and their attempted sale of the water or the right to use the same was wholly void."

The contention of counsel for plaintiff that the increase in the spring and in Wyman Creek consists of "developed" water cannot be maintained. "Developed water," says Mr. Kinney, "may be defined as such subterranean or underground water as is discovered and brought to the surface by the exploitation of man, and which otherwise would run to waste." (Kinney on Irrigation and Water Rights, 2d ed., sec. 1205.) The foregoing definition is not inconsistent with what was said in *Beaverhead Canal Co.* v. *Dillon El. L. & P. Co.*, 34 Mont. 135, 85 Pac. 880, 882, or in *Smith* v. *Duff*, 39 Mont. 382, 102 Pac. 984, 133 Am. St. Rep. 587. One cannot be said to have *developed* water who has diverted it from a running stream and has conveyed it elsewhere. The idea of developed water connotes obtaining subsurface waters which have not theretofore been available.

In *Beaverhead Canal Co.* v. *Dillon El. L. & P. Co.*, supra, the court quoted the following from Farnham on Water and Water Rights, section 672d: "When an appropriation is made of the water of a stream, the rights of the appropriator are limited to the natural condition of the stream at the time the appropriation is made, and he has no interest in improvements

subsequently made which increase the supply of water flowing in it. Therefore, if by his own exertions another increases the available supply of water in the stream, he has a right to appropriate and use it to the extent of the increase." *State ex rel. Zosel* v. *District Court,* 56 Mont. 578, 185 Pac. 1112, is to the same effect. But the rule clearly has no reference to a condition such as is presented here. It has reference to developed water, or what is equivalent thereto, as is illustrated in *Spaulding* v. *Stone,* supra, in which it is said: "If by the construction of the ditch the defendants have developed a new supply of water, or, in other words, have collected from the lands in sections 21 and 22 water which forms no part of the sources of the natural flow in the brook, they are entitled to the exclusive use of it for any purpose to which they may choose to devote it"—citing *Beaverhead Canal Co.* v. *Dillon El. L. & P. Co.,* supra, and *Smith* v. *Duff,* supra. In other words, the rule contemplates the increase of a stream occasioned through the exertions of man directed to that end, and does not contemplate accessions to the stream through the process of nature, as by percolating waters.

Nothing we have said affects the right of one to employ █ a natural channel for the conveyance of water which one is entitled to use. Had plaintiff collected from the Mungas lands waters which did not form a part of the sources of Wyman Creek, and deposited the collected volume in the channel of that stream, plaintiff could have reclaimed the water so collected therefrom, if, in so doing, the rights of the prior appropriators were not diminished in quantity nor deteriorated in quality. (Sec. 7096, Rev. Codes 1921.) But by no stretch of construction can this section be held to contemplate the right of one to take from the flow of a stream an increase caused solely by percolation resulting from irrigation upon adjacent lands.

Nor is the situation affected by section 7116, Id., to which █ reference was not made in the briefs or arguments of respective counsel. This section was one of four enacted by the territorial legislature in 1877 "to regulate the sale of

water and encourage the pursuits of industry.'' These sections have survived without change as sections 7113 to 7116, inclusive, of the Revised Codes of 1921. Section 7113 requires one who has a ''surplus of water'' and ''the right to sell and dispose of the same'' to do so upon the conditions prescribed; 7114 requires the purchaser to provide the means of taking the water from the seller; 7115 provides remedies for the purchaser if the seller refuses to deliver; and 7116 declares: ''Nothing in the three preceding sections shall be so construed as to give the person acquiring the right to the use of water, as therein provided, the right to sell or dispose of the same after being so used by him, or prevent the original owner or proprietor from retaking, selling, and disposing of the same in the usual and customary manner, after it is so used as aforesaid.''

The rationale of the Act is plain when we consider the history of the period which gave rise to the necessity for its enactment. Placer mining was still in vigorous operation in all the principal ''gulches'' and in many of the lesser ones. It was impossible advantageously to move the auriferous gravels from their beds without the use of powerful heads of water. Most of the gulch channels did not produce a sufficient amount. The necessity for large bodies of water increased as the gravels became less productive. It was the practice from the earliest days to bring in bodies of water from adjacent streams for use in mining. Some of the necessary ditches and flumes were long and expensive. Companies were organized for the purpose of supplying water which they sold to placer miners at a certain rate per miner's inch. As an illustration, the first legislative assembly created James H. Febes and another, their associates or assigns, a body corporate by the name of the Rams Horn Ditch Company, authorizing the company to take water from Rams Horn Creek, and to convey it to Bivens Gulch, and thence to other mining districts ''as said water can be led and used to advantage.'' The company was authorized ''to sell water to purchasers at the following rates: for the first use of water fifty cents per

inch and all other uses not to exceed twenty-five cents per inch per day.'' (Bannack Laws, 553.)

The water, unless restrained, ran from one claim to another, and manifestly if the creators of the enterprise were not permitted, as it were, to reclaim the water and sell it to the miners in succession, there would be no profit from the enterprise. It was necessary to give them the right to recapture and resell the water. The law respecting the use of water flowing naturally in a gulch, as distinguished from that brought in for sale, was stated thus in *Alder Gulch Consol. Min. Co.* v. *Hayes,* 6 Mont. 31, 9 Pac. 581: ''We think it to be the law that in a mining gulch, when water appropriated by a ditch for the purpose of being used upon a mining claim has served its purpose upon such claim, it must be discharged therefrom for use by the owners of claims below for use upon their claims. The mining claimant below is entitled to the water of the stream flowing down the gulch, subject to the prior appropriation of the water by the owners of claims above him for use upon such claims, and subject only to the reasonable diminution and deterioration by its necessary use upon such upper claims.''

Whatever may be the extent of the right of one who is authorized to sell or otherwise dispose of water for commercial purposes under the provisions of section 7116, it must be held that this provision of the law relates to the sale and disposition of water by volume. It can have no application to water which, within legal contemplation, has been abandoned by its disappearance in the soil, and which through seepage and percolating channels reaches the waters of a natural stream.

Water used in irrigation, except that which escapes control and runs away upon the surface, sinks in the ground; and, less that part which is consumed by plant life ''mingles with the soil and remains suspended therein,'' or by percolation reaches bedrock, which frequently is the bed of a stream. Becoming part of the stream, it is available for further use, and subject to appropriation. It is by ''this process of return-

ing to the stream after use that makes it possible for the same volume of water, or a major part of it, to supply many persons, * * * even though the first appropriator claims the whole volume, and can, at times, or even constantly, use the same for some industrial purpose, because such use does not usually swallow it, but leaves it available to others. But by such an appropriation the first appropriator does not acquire a pre-emption of the whole creek, so that he, or his successor, may, after enjoying the use of it for some beneficial purpose, convey the creek away and cut off subsequent appropriators. Therefore a subsequent right to use the same water, or so much of it as returns to the creek, and to use the waters of the creek when the first is not using the same, may be acquired." (*Creek* v. *Bozeman Water Works Co.*, supra.)

Such, we are convinced, are settled principles with respect to waste and percolating waters.

Whether, under unusual circumstances, such as appeared in *Ide* v. *United States*, 263 U. S. 497, 44 Sup. Ct. Rep. 182, 68 L. Ed. 407, relied upon by the plaintiff, a different rule—an exception to the general rule—controls, we need not now express an opinion. The supreme court of the United States there had under consideration the use of water on a government project. Before the government constructed its canals and ditches all of the lands were dry. The ravine, called Bitter Creek, into which seepage flowed after the government had brought water upon the adjacent lands, except for the run-off from melting snow and during the period of exceptional rains, was naturally dry. In disposing of lands within the project in small parcels the government, said the court, "invests each purchaser with the right to have enough water supplied from the project canals to irrigate his land, but it does not give up all control over the water or to do [*sic*] more than pass to the purchaser the right to use the water, so far as may be necessary, in properly cultivating his land. Beyond this, all rights incident to the appropriations are retained by the plaintiff." The court also said that "at no time was there any purpose to abandon the seepage. On the

contrary, the plaintiff needed and intended to use all of it for project purposes. This was stated and restated in various official reports, including some by the Director of the Reclamation Service and the Secretary of the Interior, and was well understood by the project officers.'' When seepage began to appear in appreciable quantity the governmental officers ''took up the formulation of plans for utilizing it.''

*United States* v. *Haga*, 276 Fed. 41, upon which plaintiff chiefly relies, arose over a government project. As a part of the project the government took over a canal which supplied water to farmers, and added greatly thereto by extensive works. Wastage and seepage flowed from the original canal and also from the new works into a stream called Eight Mile Creek, in which, in normal seasons, there was not any natural flow later than June 1. After the commencement of the irrigation season most of the water flowing in the channel had ''its source in surface waste and seepage incident to the use of water from the government canals in the irrigation of lands lying along or near the creek above the defendant's point of diversion.'' The defendant, asserting rights based upon appropriation, took this water and the government brought suit in the United States district court for Idaho. Judge Dietrich held defendant entitled to the water which had ''wasted'' from the canal. He said that for 18 years the canal company and its stockholders ''had caused or permitted the water to pass from their lands into a natural channel physically tributary to the stream from which it had been originally diverted, and to 'waste' in a very real sense. Defendant's lower ditch was constructed in the early nineties, so that during all of this 18 years he was making beneficial use of a part of the water. His upper ditch was constructed in 1908, after several years of open abandonment of the water by the canal company, and thereafter he continued to divert the water through the upper ditch without interference or objection for five years, * * * during all of which period the canal company continuously permitted the water to waste and manifested no intention to recapture or again to

use it. Clearly, it must be held to have abandoned such right as it may have had; at least, it could not under such circumstances reclaim the water and dispose of it to a third person to be used in any other territory, to the detriment of one who in good faith had appropriated it and was using it for beneficial purposes.''

But as to the water appropriated and brought to the lands adjoining Eight Mile Creek by the government, he ruled against the defendant, saying that the government had made public declaration of its intention to reserve all waste and percolating waters as early as 1913 and ''the form of application for water rights prepared by the reclamation service contained a provision reserving to the government the right to reclaim waste water.'' The judge declared: ''One who by the expenditure of money and labor diverts appropriable water from a stream, and thus makes it available for fruitful purposes, is entitled to its exclusive control so long as he is able and willing to apply it to beneficial uses, and such right extends to what is commonly known as wastage from surface run-off and deep percolation, necessarily incident to practical irrigation. Considerations of both public policy and natural justice strongly support such a rule. Nor is it essential to his control that the appropriator maintain continuous actual possession of such water. So long as he does not abandon it or forfeit it by failure to use, he may assert his rights. It is not necessary that he confine it upon his own land or convey it in an artificial conduit. It is requisite, of course, that he is able to identify it; but, subject to that limitation, he may conduct it through natural channels and may even commingle it or suffer it to commingle with other waters. In short, the rights of an appropriator in these respects are not affected by the fact that the water has once been used.''

This language was quoted with approval in *Ide* v. *United States,* supra. Essentially, it would seem, this declaration is based upon the ''intention'' of the government. If it could be supposed that we would agree with portions of this declaration in any case, still, under the decision in the *Haga Case,*

plaintiff here could not recover, for it is in the same position as was the plaintiff in that case with respect to wastage from the canal. From 1916 until 1928 plaintiff's stockholders (plaintiff had sold the water) permitted the water, after being used for irrigation, to pass from their lands regardless of what might become of it.

We reiterate that the general rule, applicable to the conditions in the case before us, is that the owner of the right to use the water—his private property while in his possession,—may collect it, recapture it, before it leaves his possession, but after it gets beyond his control it thus becomes waste and is subject to appropriation by another. (*Newton* v. *Weiler,* 87 Mont. 164, 286 Pac. 133; *Galiger* v. *McNulty,* supra.) And so it is with percolating water. (*Popham* v. *Holloron,* supra.)

If the rule were otherwise we should be compelled to hold that on this feature of the case *Galiger* v. *McNulty,* supra, was incorrectly decided; and the Bitter Root Valley Irrigation Company, whose canal lost water by seepage, creating the supply over which Popham and Holloran were litigating, could "recapture" the water from Popham who prevailed in that lawsuit. (*Popham* v. *Holloron,* supra.) The rule contended for by plaintiff would lead us into "a morass of practical difficulties and doctrinal refinements." It would disturb the settled policy upon which the owners of water rights of this state have depended, founded upon the decisions of this court, through the long course of the years. Derangement of a policy so deeply rooted is not to be contemplated except under a compelling necessity, which does not seem to exist.

We cannot say that the record does not sustain the finding of the trial court that the defendants Miller appropriated 120 inches of water and we see nothing to criticise in the date given it. (*St. Onge* v. *Blakely,* 76 Mont. 1, 245 Pac. 532; *Wheat* v. *Cameron,* 64 Mont. 494, 210 Pac. 761.) Clearly the defendants Miller made use of all the waters of Wyman Creek except the 25 inches to which Carey had a prior right,

whether consisting of the flow in ordinary season or of the accretions thereto made by the melting of snows and seasonal rains. They used also the increase in the waters of the spring and of Wyman Creek for the irrigation of their lands, which were put under irrigation as quickly as their facilities would permit. The record indicates that they had appropriated and had made use of 120 inches of the waters of Wyman Creek long before Hickey made any attempt to use any of those waters.

Other contentions of plaintiff were decided against it by the trial court, and we see no error.

The judgment is affirmed.

ASSOCIATE JUSTICES ANGSTMAN and MATTHEWS, and HONORABLE FRANK P. LEIPER and HONORABLE R. M. HATTERSLEY, District Judges, sitting, respectively, for ASSOCIATE JUSTICES GALEN and FORD, disqualified, concur.