JOHN E. PERKINS, Plaintiff and Respondent, v. JOE M. KRAMER, VINCENT J. LOWERY et al., Defendants and Appellants.

No. 10709.
Submitted October 7, 1966. Decided December 9, 1966.
423 P.2d 587.

Keeley & McElwain, Donald J. Beighle, Joseph A. McElwain (argued), Deer Lodge, for appellants.

William Taylor, Deer Lodge, Picotte & Loble, Helena, M. K. Daniels (argued), Deer Lodge, Henry Loble (argued), Helena, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment entered in favor of the respondent in an action for declaratory judgment granting respondent certain water rights in Dempsey Creek, Powell County.

The history of this case is a long one. Dempsey Creek is a living stream of fresh water arising in a high mountain area on the west side of Deer Lodge Valley and flowing generally eastwardly into Deer Lodge River. During summer months the entire flow of Demsey Creek is used for the irrigation of the agricultural lands of the parties to this action, but during the winter months, no use is made of the flow of Dempsey Creek. During the spring runoff there is an excess of water over the needs of the appropriators and during such periods there is no beneficial use made of the waters of the creek. On April 25, 1892, a Decree and Judgment was entered in Cause No. 404 in the District Court of Deer Lodge County (in which county Dempsey Creek was then located) under which Decree the water rights in Dempsey Creek were adjudicated. The parties to this action are successors in interest to the several parties in Cause No. 404.

The North Fork of Dempsey Creek, a main contributor to the flow of the creek, flows from the north side to the south side of respondent's Section 32 through a narrow canyon, the sides of which rise to a rocky plateau. The South Fork joins the North Fork near the south boundary line of the Section. It is above the juncture and between the two forks of the stream that respondent has his system for capture of water. Beginning in 1908, respondent diverted water from the forks of the creek and conveyed it through ditches to natural depressions or "potholes" located on this plateau. The "potholes" were filled during the winter and spring runoff at a time when such water was not needed for irrigation. During the summer months, water oozed or percolated from the ground four hundred to eight hundred feet below the potholes. This water was collected in ditches constructed by the respondent parallel to the creek and was run into the creek after being measured. The same amount of water, less shrinkage, was then diverted by respondent further downstream where the land was suitable for irrigation.

The respondent has maintained throughout that such seepage is the same water which was placed in the "potholes" and that respondent is entitled to an adjudicated right to use such water.

In 1921 respondent Perkins had a decree entered for the establishment of a water right in the seepage, joining only one other appropriator on Dempsey Creek as defendant in that action. In 1939 an action was commenced in District Court against Perkins by appropriators on Dempsey Creek who were not joined in the 1921 decree. The plaintiffs in that action claimed that Perkins was interfering with their adjudicated rights by diversion of the seepage water. Perkins prevailed at trial court but was reversed by this court on appeal in Woodward v. Perkins, 116 Mont. 46, 54, 147 P.2d 1016. We said in that case:

"The respondent [Perkins] therefore accomplished nothing

by his diversion of water into the potholes nor by measuring the flow of seepage entering the stream. The evidence is wholly inadequate to support the finding that an additional flow in the stream had been created and without which there is no support of the decree granting the additional water right."

Upon remittitur, a decree was entered in District Court on December 30, 1944, denying Perkins any rights in the seepage. On January 31, 1945, Perkins filed a notice of appeal in this court from the decree entered by the District Court. In that appeal we said: "Since an appeal does not lie from the judgment entered in the district court in conformity with and upon remittitur from the Supreme Court nor from the orders specified in defendants' notice of appeal, the motion of the plaintiffs to dismiss must be and it is granted and the attempted appeal dismissed." Woodward v. Perkins, 119 Mont. 11, 29, 171 P.2d 997, 1005. Thereafter, and until the Fall and Winter of 1949-1950, respondent ceased to divert water into the "potholes."

On September 21, 1946, Perkins filed a special proceeding in this court seeking a writ of supervisory control against the district court in an attempt to have the decree of December 30, 1944, withdrawn. This court, by formal written order, refused to permit the application and petition to be filed or considered.

The action in which the present appeal is taken was commenced by Perkins on February 18, 1947, in a suit for a declaratory judgment. In his prayer for relief, the respondent alleged that under the decree of December 30, 1944, he was uncertain with respect to his right to place water in the "potholes," to collect and use the "seepage" from the "potholes," and to conduct experiments in an effort to prove that the seepage water was the same water placed in the "potholes." Demurrers to this complaint were sustained and judgment was entered dismissing the action. Once again Perkins appealed to this court and in Cause No. 8767 (reported as Perkins v. Kramer, 121 Mont.

595, 599, 600, 198 P.2d 475, the judgment of the district court was reversed. The purpose of remanding the cause was to permit respondent to conduct experimentation necessary to prove that the seepage water came from his "potholes." This court said: "If plaintiff can prove his allegations he can show that by his system of storing water he can irrigate some of his land with waters which otherwise run to waste and without injury to anyone." Perkins v. Kramer, supra. And further, at page 600, 198 P.2d at page 477: "The judgment is reversed and the cause is remanded with directions to set aside the order sustaining the demurrer and to enter an order overruling it and allowing defendants a reasonable time to further plead to the complaint." Except for the rather broad language cited above, the opinion of this court in Cause No. 8767, did not indicate the quantum of proof necessary nor did it suggest any particular mode of experimentation.

In remanding the case for further proceedings, this court was divided on the question of res judicata, with the majority ruling that the doctrine of res judicata did not prevent reversal to correct "manifest error in its former judgment." Perkins v. Kramer, 121 Mont. 595, 600, 198 P.2d 475, 477. The dissent felt that there was no such error and that the rights of the parties had been determined for all time. While we do not find it necessary to deal directly with the matter of res judicata on this appeal, we do feel that the opportunity given to respondent Perkins to conduct further experiments was somewhat anomalous in the water law of this state.

Upon remittitur the district court made an "Order Pending Completion of Litigation" which incorporated by reference an agreement entered into by the respondent and the appellants. In general terms this agreement and order stayed further proceedings and called for miner's inch boxes to measure the flow of Dempsey Creek to be placed in the creek at points above and below where the seepage drains entered the creek. The agreement further provided that during the irrigation season of 1950

the Water Commission should take daily measurements of the water passing through the two measuring boxes. If any increment were noted in the amount flowing through the lower measuring box, four-fifths of such amount would be deemed to be water developed by the respondent through his "pothole" system and would accrue to the use and benefit of the respondent. The agreement and order required the parties to complete the pending litigation after November 1, 1950, and obtain a court decree establishing the respective water rights. Such decree was to provide for measurements during each subsequent irrigation season, not to establish the respondent's right to the seepage water, but merely to determine the extent or quantum of that right.

No further pleadings were filed in 1950. Appellants filed an answer on August 30, 1956, and in 1957 Perkins was enjoined from using the seepage water. After further delays the matter came on for hearing on June 4, 1962. Testimony concerning the conduct of the experiment undertaken by agreement of the parties was heard and the district court entered judgment in favor of the respondent Perkins, restoring to him any rights to the waters of Dempsey Creek which had been denied in prior judicial proceedings. The trial judge ruled, after hearing the testimony and personally viewing the site of the "potholes," that the respondent had proven the identity of the seepage and "pothole" water and was entitled to an appropriative right to water so developed.

The specifications of error set forth on this appeal indicate two fundamental issues. First, whether the respondent was entitled to any water rights by virtue of the agreement between the parties, and whether respondent satisfied the burden of proving that the seepage came from the "potholes."

As to the agreement, we do not feel that this court is limited to the provisions of that instrument in resolving the issues here presented. The agreement resulted from the remittitur by this court in Perkins v. Kramer, 121 Mont. 595, 198

P.2d 475, and was entered into under compulsion thereof. The clear intent of the agreement was to promote an amicable settlement of the dispute and to provide an experimental basis for further pleadings, required by order of the district court. The agreement contemplated the issuance of a decree by the district court fixing the rights of the parties and did not of itself create any right to the waters of Dempsey Creek. A contrary result would permit the parties to circumvent the jurisdiction and authority of the district court and of this court through private agreement.

The real issue on this appeal is whether Perkins satisfied the burden of proving that the seepage water claimed came from his "potholes." In the case of Rock Creek Ditch Etc. Co. v. Miller, 93 Mont. 248, 268, 17 P.2d 1074, 1080, 89 A.L.R. 200, this court said: "We reiterate that the general rule, applicable to the conditions in the case before us, is that the owner of the right to use the water—his private property while in his possession,—may collect it, recapture it, before it leaves his possession, but after it gets beyond his control it thus becomes waste and is subject to appropriation by another." We do not believe that the respondent established a sufficient degree of "control" over the seepage water to be entitled to an appropriation based on a developed source of water.

Water Commissioner Kelley took measurements on Dempsey Creek during the irrigating season of 1950 as required by the agreement and testified for respondent. According to the Commissioner's records for that year, there was a gain in flow between the upper and lower measuring boxes during the summer months. However, the testimony of Commissioner Kelley indicates that there was "a lot of extra water running to the river" at that time, and that such extra water was caused by heavy rains. Kelley testified that 1951 was "another wet year."

The respondent Perkins made infrequent and fragmentary observations of the upper and lower boxes in 1950 and the following years, indicating some gain during the summer

months. Other witnesses appeared for the respondent giving general testimony indicating that the drain ditches had dried up during the period when the "potholes" were not filled, and that vegetation near the "potholes" had ceased to grow.

A witness for the appellants was Koehler Stout, a qualified geological engineer. Based on examination of the "pothole" system, Mr. Stout testified that it was his opinion that the water table in the drainage area lay close to the surface, as evidenced by the fact that the largest "pothole" retained some water the year around. This witness felt that most of the seepage would result from the high water table, and that the filling of the "potholes" would account for seepage only to the extent of the capacity of the "potholes," a relatively small amount of water. Respondent did not present any expert testimony to support his conclusions. There was further evidence presented by appellants of beaver dams located on the creek between the upper and lower measuring boxes which might influence the flow between them.

While there is certainly some indication on the record that the seepage might in fact result from the filling of the "potholes," the evidence to that effect presented on this appeal is substantially that available on previous appeals of the same issue. Respondent admits that he is uncertain as to the amount of water his "pothole" system is capable of storing. In his brief, respondent states: "While it must be admitted that Perkins is physically unable to trace the water in its course through the glacial drift to the drains, there is no good reason why he is not entitled to the water collected at the drains any more than if it flowed from the potholes to the drains by a surface ditch." We cannot accept the logic or legal soundness of this argument. The fact that groundwater is not easily traced in its movement is the reason why this court has said: " 'The secret, changeable, and uncontrollable character of underground water in its operations is so diverse and uncertain that we cannot well subject it to the regulations of law,

nor build upon it a system of rules, as is done in the case of surface streams.' (Chatfield v. Wilson, 28 Vt. 49)." Ryan v. Quinlan, 45 Mont. 521, 532, 124 P. 512, 515. If the respondent utilized the water in his "potholes" through surface ditches or other means directly conveying the water from the storage site, there would be no problem. The appellants agree that if Perkins piped water from his "potholes" there would be no controversy.

Modern Hydrological innovations have permitted more accurate tracing of groundwater movement. For this reason, we feel that traditional legal distinctions between surface and groundwater should not be rigidly maintained when the reason for the distinction no longer exists. The use of chemical dyes, chloride solutions, and radioisotopes to trace groundwater migration is well-established. More recent techniques include the use of electric analogs and computer analysis. These tracing methods require the drilling of test wells as well as geological analysis of the water-bearing structure. See "Water Supply Engineering," Babbitt and Doland (1931); "Hydrology," Ed. Mainzer (1942); "Ground Water Hydrology," Todd (1959); "Theory of Acquifer Tests," Geological Survey Water-Supply Paper 1536-E, U. S. Gov't Printing Office (1962); "Electric Analog of Three-Dimensional Flow to Wells and Its Application to Unconfined Acquifers," Geological Survey Water-Supply Paper 1536-H, U. S. Gov't Printing Office (1963); "Methods of Determining Permeability, Transmissibility and Drawdown," Geological Survey Water-Supply Paper 1536-I, U. S. Gov't Printing Office (1963). Most of these techniques were available at the time the respondent attempted to prove the identity of the seepage water, but none were utilized.

The burden of proof necessary to show the use of natural subterranean watercourses as conduits in a developed reservoir system must be a substantial one. There should be some recourse to modern hydrological techniques and not mere conjecture based on inconclusive data and ordinary observation.

The testimony of Water Commissioner Kelley clearly indicates that part of the increase in the flow of Dempsey Creek was attributable to heavy rains. Respondent is unable to state the capacity of his "pothole" system. Even if it were possible to establish an appropriative right to such seepage waters, the amount of water to which respondent would be entitled thereunder could not be determined on any rational basis through the use of the measuring boxes. The great possibility of injury to the rights of other appropriators is as clearly demonstrated by the evidence before us as is the right of the respondent himself to use the seepage water.

It is the announced policy of this state to promote the irrigation of land wherever possible. Allen v. Petrick, 69 Mont. 373, 222 P. 451. But we cannot do violence to the orderly development of our water resources in the fashion advocated by the respondent. At most, respondent has proven that he has a reservoir composed of surface water and groundwater, in undetermined quantities, that this reservoir leaks into Dempsey Creek. The respondent has failed to prove that he retains any actual control over the water after it is placed in his "potholes," or provided a sound scientific basis for determining how much of the seepage during what period he might be entitled to.

In light of the evidence presented on this appeal, we must hold that the respondent has not established an appropriative right to the seepage water. Since this seepage is a tributary flow of Dempsey Creek, the respondent can not take such water to the detriment of other appropriators. Woodward v. Perkins, 116 Mont. 46, 53, 147 P.2d 1016.

In his complaint for declaratory relief, respondent indicates that he is uncertain as to his right to divert water into his "potholes" when the water would otherwise run to waste. It should be quite clear from what has been said on previous appeals that the respondent does have such a right. There is no issue here as to whether respondent can fill his "potholes" during the

winter and spring when the rights of other appropriators would not thereby be injured. We are explicit on this matter only to eliminate possible confusion and to preclude further litigation.

We might comment briefly on the vigorous dissent to this opinion written by Judge Allen. One not familiar with the history of this case might not appreciate the gravamen of our decision. Judge Allen does not like the result; and in his vigorous style has made an apparently serious indictment of the majority of this Court. However, his disagreement is more apparent than real. Judge Allen points out the difficulty of two Doctors agreeing on the interpretation of X-ray; but he does not really mean that X-rays are useless and prove nothing. We agree with the dissent that the district judge was in a superior position to determine the factual issues. The testimony in the record is satisfactory, as far as it goes. But we feel that the district judge did not impose the substantial burden of proof; that is to say the legal standard or rule of law which must be met to establish the right sought by the respondent. Although the legal standard of proof and evidence presented to meet that burden are of necessity interrelated, it is important to distinguish them on this appeal. We do not seriously disagree with the findings of fact of the district court. What we do say is that respondent did not present enough of the right sort of facts to prove his claim.

The judgment and decree are reversed and the cause remanded with directions to enter a decree for the appellants adjudging void respondent's claim to an additional water right as set forth in his complaint.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICE ADAIR, concur.

HONORABLE NAT ALLEN, District Judge, sitting in place of MR. JUSTICE DOYLE, dissenting.

I dissent. As can be seen from the lengthy history of this case in the majority opinion there has been an argument between the majority and the minority of this court about facts and the majority now proposes to perpetuate this argument about facts on into some distant date in the future.

This court has a rule to settle factual disputes and it has been expressed some 54 times where a judge has decided the facts, see Digest, Appeal and Error, 931. The most recent expression of the rule by all the members of this court is contained in Marshall v. Minlschmidt, 148 Mont. 263, 419 P.2d 486, a trust case wherein it quotes from Lewis v. Bowman, 113 Mont. 68, 121 P.2d 162.

"In an equity case the findings of the trial court will not be disturbed on appeal unless the evidence CLEARLY PREPON-DERATES against them, and when the evidence, fully considered, furnishes a substantial basis for the findings they will be allowed to stand. [Citing cases.] Moreover, this court cannot lose sight of the fact that the trial judge had the decided advantage of seeing the witnesses and hearing their testimony and observing their conduct and demeanor upon the stand."

In these cases, two very competent district judges, McHugh and Duncan, had the opportunity to go up and look at the pot holes on Dempsey Creek to help in their determination of the facts and hear the witnesses. And now the court proposes again to ignore their findings of fact by stating that the "Burden of proof that is necessary to show the use of natural subterranean water courses and conduits in developing reservoir systems, must be a substantial one."

If I understand this correctly the rule as stated in Marshall v. Minlschmidt, supra, is okay for trust cases but in water cases a different rule applies; in fact, the opposite rule applies. Such vacillation would allow this court to establish yet another rule in contract cases, and a third rule in tort cases ad infinitum. I think the same rule should apply in all cases and especially in this one where the evidence was so strong in my opinion, that

the district judge could not do otherwise than he did. This is the second district judge that has made the same findings on this same water dispute and without a doubt the third district judge would do no differently. As was said in In re Cocanougher's Estate, 145 Mont. 60, 68, 399 P. 420, 425: "Further, there must, in all cases, be an end to litigation."

The majority now suggests that there should be some recourse to modern hydrological techniques to establish the facts in this case. When we receive the great diversity of scientific opinion which two doctors express in court, both looking at the same x-ray, and giving different opinions on it, I do not think that scientific testimony will settle this matter any more than the excellent evidence we have before us. Undisputed evidence shows that when these pot holes are not filled up the springs on the creek dry up and the measurement in the creek above and below these springs is almost identical. That, to me, is stronger evidence that any hydrologist or anyone else could produce. (Transcript 244 et. seq.; 305 et seq.; 369 et seq.) Justice Angstman in his dissent in Woodward v. Perkins, 119 Mont. 11, 32, 171 P.2d 997, 1007, back in 1946 wrote:

"* * * We were advised by counsel for defendants at the oral argument and in the brief that since the decision on the former appeal water has not been diverted by defendant Perkins into the 'pot holes' and that, as a consequence, there has been a cessation of the flow into the drain ditches, *which demonstrates rather convincingly that the water intercepted in the drain ditches came from the 'pot holes'* and he contends that defendants should be permitted to so show. This demonstrative proof was not in existence at the time of the trial. *Such evidence would be particularly convincing if upon filling the 'pot holes' again there would be a revival of the flow into the drain ditches,* no other cause therefore intervening." Emphasis supplied.

Judge Angstman's convincing evidence has now been shown at this trial. No water whatever was put to any of the pot holes in the Fall of 1948 or the Winter or the Spring of 1949,

(T. 397) with the idea being a check would be made to see if the water emerging from the base of the glacial plateau would completely dry up. With the concurrence of all parties, (T. 310, 311) the measuring boxes were installed so that measurements would be made above and below the area of the drains to prove whether the drying up of the pot holes would result in a drying up of the drains. (T. 409) This, of course, is exactly what happened. The measurements made showed on July 3, 1949, a gain of only two inches. (T. 308) On July 20, 1949, a gain of only three inches; and later in July, a loss of nine inches. (T. 310)

To me this proves overwhelmingly, as Justice Angstman said it would to him, that failure to fill the pot holes resulted in the drying up of the area of the drains; and further, satisfied everybody on the creek because they then entered into an agreement set forth in the transcript, page 161, and everybody was happy for many years. The majority suggests that this agreement was entered into under compulsion because of prior decisions in this case, but that is conjectural and not based upon anything in the record.

I think it was entered into freely because the other water users were convinced Perkins was getting *none* of their decreed water. This alone should settle the case from an evidentiary standpoint. The court criticizes the evidence because the "respondent is unable to state the capacity of his pot hole system." If that has to be done of course his burden is insurmountable. He does state he runs water into the pot holes all Winter and all Spring until the water commissioner takes over.

The court further states that even if it were possible to establish appropriative right to such seepage waters, the amount of water to which respondent would be entitled thereunder could not be determined on any rational basis through the use of the measuring boxes. This I cannot see. These measuring boxes are the same that are used throughout the State of Montana to measure all decreed creeks and I do not know why anyone would

determine that such a basis for measuring water is irrational. At least no reason is given therefor.

That these reservoirs or pot holes leak into Dempsey Creek, not even the majority opinion denies. The defendants' expert witness even agrees with this, only in his opinion it does not last as long as plaintiff contends. This would indicate to me that rather than a failure of substantial proof there is a substantial agreement among the witnesses.

The hydrologist's testimony is interesting to quote. (T. 507) He said in this case, when it was explained to him, that prior to putting any water in the pot holes, in 1908, it was dry and without vegetation near the creek below this plateau and that after water was put in the pot holes vegetation grew and springs began to show. His explanation of it is at page 508.

"A. I still think it was probably a geological coincidence that caused that. *Certainly the amount of water he put into those pot holes came out the bottom, I mean, I have been saying that all along,* but to continue, the amount of water to come out in any excess of what he puts in has to come from some place else in my opinion.

"Q. So it was just a coincidence that after Mr. Perkins put water in those pot holes in 1908 that it got wet and swampy and springs and so forth along Dempsey Creek, that was a coincidence? A. That could be a possible explanation of it. *I really don't know.* I'm just saying that it's a coincidence. We have earth changes rather rapidly. The Madison earthquake in 1959 caused a lot of springs to dry up and a lot of new ones to form and something like that could have happened. I'm not saying that it did."

Clifford Perkins testified on page 250, speaking of the numbered pot holes:

"A. Oh, that No. 2 will hold water for six weeks to two months.

"Q. What about No. 3 and 4? A. They won't hold very long.

"Q. And what about No. 1? A. It will hold water the year round."

This evidence is undisputed in the record.

The majority further says that respondent failed to prove that he retained any actual control of the water after it is placed in the pot holes or provided a sound scientific basis for determining how much seepage he might be entitled to. It seems to me that if the expert agrees that the water comes out below in springs and gets into Dempsey Creek that that is pretty good control since when he shuts the water off the water in the springs ceases to flow and when he fills the pot holes the water flows again. I don't know what greater control the court expects in a situation like this. As far as providing a sound scientific basis for determining how much of the seepage he might be entitled to it seems to me that since Perkins gets only 80 percent of the increased flow above and below these springs that such a percentage is giving all the benefit of the doubt to the decreed water users. The majority criticized because respondent Perkins made infrequent and fragmentary observations of the upper and lower boxes in 1950 and following years. I admit that his evidence may not be convincing, but I remind the majority that Water Commissioner Kelley testified as to the results of the experiment made in 1950 and on June 1 through 13 he gave Perkins 89 inches of water which is 80 percent of the gain between the upper and lower measuring boxes. July 15 Perkins was given 172 miner's inches of the gain, July 19 Perkins was given 168 miner's inches, through the rest of July Perkins was given about 160 miner's inches. August 1 through 14 Perkins was given 146 miner's inches, down to 95 miner's inches dropping a little each day. All of this was testimony by an uninterested person and the 20 percent margin allowed for other seepage, which may well occur in the rainy weather, was in my opinion generous and amply protects the decreed water users and even benefits them, thereby following the "announced policy of this State to promote the irrigation

of land wherever possible." This quotation is from the majority opinion.

The findings of the lower court should be upheld.

MR. JUSTICE JOHN C. HARRISON:

I concur in Judge Nat Allen's dissenting opinion.