**Lottie E. TWEEDY and Samuel E. Tweedy, Plaintiffs,**

v.

**The TEXAS COMPANY, a Delaware corporation, a/k/a Texaco, Inc., Defendant.**

**Civ. No. 2738.**

United States District Court
D. Montana,
Great Falls Division.

June 14, 1968.

Crowley, Kilbourne, Haughey, Hanson & Gallagher, Billings, Mont., for plaintiffs.

Patrick L. Donovan and John F. Bayuk, Shelby, Mont., for defendant.

OPINION AND ORDER

RUSSELL E. SMITH, District Judge.

In this diversity case removed from the state court plaintiffs, citizens of Montana, seek damages in the amount of $222,182.00 from the defendant, a Delaware corporation, with its principal offices in New York. The gist of plaintiffs' complaint is that the defendant took 444,374 barrels of underground water belonging to the plaintiffs. The parties submitted the case for decision upon an agreed statement of facts.

On July 1, 1937, the Aronsons, the then owners of the land described in the complaint, all of which is located within the exterior boundaries of the Blackfeet Indian Reservation, granted to the defendant an oil and gas lease. The lease

was recorded in October, 1937. It provided, in part, as follows:

"1. Lessor, in consideration of the sum of Ten and no/100 Dollars ($10.00), in hand paid, of the royalties herein provided and the agreements of lessee herein contained, hereby grants, leases and lets exclusively unto lessee, for the purpose of testing by any method for formations and prospecting and drilling for and producing oil and gas, laying pipe lines, building tanks, storing oil and building powers, (sic) stations, telephone lines and other structures (including houses for employees) thereon, to produce, save, take care of, treat and transport said products, the following described land in Glacier County, State of Montana, towit:

\* \* \* \* \* \*

"2. Subject to the other provisions herein contained, this lease shall remain in force for (a primary term) and as long thereafter as either oil or gas is or can be produced from any well on said land; \* \* \*

\* \* \* \* \* \*

"6. Lessee shall have the free use of \* \* \* water from said land, except water from lessor's wells, for all operations hereunder \* \* \*"

On May 15, 1951, the then fee owners of the land executed a "Surface Rights Deed" in which the plaintiffs were the grantees. That deed provided, in part, as follows:

"(P)arties of the first part, \* \* \* grant, bargain, sell and convey unto the said parties of the second part \* \* \* all of the surface rights in and upon the following described land (with the reservations hereinafter set forth) \* \* \*

\* \* \* \* \* \*

"The parties of the first part expressly reserve unto themselves, \* \* \* all minerals, mineral deposits, mineral oils and natural gases of every kind or nature, containd (sic) in, under or upon said land, with the right to prospect, simk (sic) wells, erect necessary structures, operate and to do anything necessary or proper for the extraction and removal of minerals, petroleum, and natural gas at any and all times, and including the right to lay pipelines, maintain needed roads, and the right of ingress and egress.

"This grant, therefore, is and shall be subject to the terms and provisions of an existing Oil and Gas Lease, of any assignment thereof or any subletting thereunder, and of any lease or leases pertaining to or affecting the the (sic) mineral rights in said land, which may hereafter be executed and entered into by the parof the first part, their heirs or assigns.

"To have and to hold the above described land, subject to the aforesaid reservations, unto the parties of the second part, their successors or assigns, or the survivor of them. (sic) And the said parties of the first part will warrant and defend all the right, tile (sic) and interest in and to the said surface rights. \* \* \*"

On March 1, 1963, the oil and gas lease was modified by the execution of a unitization agreement to which plaintiffs were not parties. That agreement pooled the land described in separate leases and laid the legal foundations for a secondary recovery program. That program contemplated the injection of fluid, under pressure, into the oil bearing formations and the recovery of quantities of oil and gas which would not normally be recovered by merely pumping the individual wells. Secondary recovery programs do conserve natural resources,[1] and the unitization agreements necessary in many cases to such programs are authorized by statute in Montana.[2] The unitization agreement here involved was approved after a hearing before the Oil and Gas

1. See, Symposium on Rocky Mountain Oil and Gas Law, 17 Mont.L.Rev. (1955).

2. R.C.M.1947, §§ 60–130, 60–131.

Conservation Commission of the State of Montana on April 9, 1964.[3]

Since that time the defendant has used the underground water drawn from wells drilled upon the land described in the complaint for the pressurization of the area described in the unitization agreement which, as indicated, is larger than the area described in the lease. Plaintiffs seek damages at the rate of fifty cents per barrel for all of the water so used and base their claim entirely upon an ownership of the water existing as incident to the ownership of their land.

■ Plaintiffs' case fails because plaintiffs cannot establish any title in the water as such, and there is no evidence and no claim that defendant has interfered with the plaintiffs' right to use water in the satisfaction of any need for it.[4]

When the Blackfeet Indian Reservation was created, the waters of the reservation were reserved for the benefit of the reservation lands. Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). The *Winters* case dealt only with the surface water, but the same implications which led the Supreme Court to hold that surface waters had been reserved would apply to underground waters as well. The land was arid—water would make it more useful, and whether the waters were found on the surface of the land or under it should make no difference.

■ The waters being reserved are governed by federal rather than state law. United States v. McIntire, 101 F.2d 650 (9 Cir. 1939). This is so even after the trust patents are issued and lands have passed out of Indian ownership. It is necessary therefore to determine the governing Federal law. The one dominant concept which emerged from the development of the water law in the West was that all rights are in the use of the water rather than in the ownership of its corpus.

The needs of the West required that the common law doctrine of riparian rights give way to the prior appropriation doctrine; the central thesis of that doctrine being that the use of water created the right to its use—a right to use it to satisfy a need and nothing more.[5] True, the Montana doctrine of prior appropriation has been specifically rejected as the governing law on Indian reservations, but the Montana law developed, as did the law in all of the western states, in response to the needs of the land. Nothing in the Congressional language suggests that the federal law should develop differently than the state law—the converse is true. Some statutory language suggests that on Indian reservations the use concept rather than the ownership concept governs. Thus the General Allotment Act of February 8, 1887, 25 U.S.C. § 381, speaks of the right to the "use of water for irrigation." With specific reference to the Blackfeet Reservation, the act of March 1, 1907 (34 Stat. 1015, 1036) provides:

> "*Provided,* That the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure and the limit of the right: * * *."

■ It seems clear from United States v. Ahtanum Irrigation District, 236 F.2d 321 (9 Cir. 1956), cert. den. 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957) that need and use are prerequisite to any water rights on Indian reservations. In that case the court first recognized the impact of the *Winters* decision and held that at the time of the treaty the waters

---

3. As will be noted this case is not decided on the basis of Montana law and the court, in reciting the history of the case in terms of the Montana oil and gas law, does not infer that that law is or is not applicable.

4. The court does not hold that the documents upon which plaintiffs rely to establish title to the land would be sufficient to give them any rights to underground water. Plaintiffs' case fails before that problem is reached.

5. For a discussion of these concepts see Rock Creek Ditch & Flume Co., v. Miller, 93 Mont. 248; 17 P.2d 1074, 89 A.L.R. 200 (1933).

of the Yakima Reservation were reserved to the Indians. The opinion makes clear, however, the proposition that what is reserved even to the Indians is not the corpus of the water but the right to the use of it for the purpose of satisfying a need. Thus, the court said:

"It is sufficient for the purposes of this case to say that an adjudication of the rights of the United States in and to the waters of Ahtanum Creek as of 1915, would necessarily award the United States a right measured by the needs of the Indian irrigation project at that date". Id. at 328.

And:

"The rights of the white settlers to the use of the waters were subordinate to the rights of the Indians, but they were not nonexistent. Until the Indians were able to make use of the waters there was no legal obstacle to the use of those waters by the white settlers. And after the Indian irrigation works were completed, there would still be the right of the non-Indian appropriators to make use of any surplus available within the stream." Id. at 335.

Speaking of white settlers on non-reservation lands, the court said:

"We hold that at any time when the needs of those parties to that agreement, as measured in 1908, were such as to require less than the full 75 percent of the waters of the stream, then their rights to the use of the water was correspondingly reduced, and those of the Indians, in like measure, greater. This follows from the proposition that it is a fundamental maxim of the law of waters that an individual's rights, no matter how measured or described, can never exceed his needs." Id. at 341.

The case of United States v. Conrad Investment Co., 156 F. 123 (D.Mont. 1907), aff. Conrad Investment Co. v. United States, 161 F. 829 (9 Cir. 1908), relating to the Blackfeet Reservation, was decided on the theory that use and need measures the extent of water rights. Thus the court, following the decision of the Circuit Court of Appeals in the *Winters* case, enjoined the defendants from interfering with sixteen hundred sixty-six and two-thirds miners' inches of the waters of Birch Creek. That amount of water was deemed to be sufficient to fulfill the then needs of the Indians; but the decree provided a method whereby if the needs increased the decree could be modified accordingly. On the Blackfeet Reservation, at least as to surface waters, there are no rights apart from need and use.

The same economic considerations which limit rights in surface waters to need and use should apply to underground waters; although in cases where the underground water is being used at a rate faster than it is being replenished some other considerations might come into play. The legislative and decisional trend has been in the direction of applying the doctrines of need and use, at least to the extent that the doctrine of prior appropriation increasingly is being applied to underground waters.[6] In any event, this court is unwilling, in the absence of controlling legislation or decisions, to apply a concept of ownership which has been rejected throughout the West, and on the Blackfeet Reservation in the case of surface waters. The court is unwilling to introduce a concept which would allow the owners of the surface of the land to play the role of the dog in the manger with the waters under the land. It is not necessary for the solution of this case to delineate exactly the rights of the parties. It is sufficient to say that the plaintiffs have demonstrated no use of the water and no need for it—they have shown no right which the defendant has invaded.

The court does not intimate that one man may enter upon another's land and drill to find underground water. In this case, however, the defendant, by reason of the oil and gas lease, did have a right

---

6. Clark, Ground Water Legislation in the Light of Experience in the Western States, 22 Mont. L.Rev. 42 (1960).

to the use of enough of the surface to drill a water well in connection with its oil and gas operations. There is here therefore no concern with the rule, if it be a rule on reservation lands, that a right to the use of water may not be initiated by trespass.

It is therefore ordered that the plaintiffs be denied all relief with respect to that part of its claim for damages for the use of water.

The court reserves for further consideration plaintiffs' claims arising under Paragraphs 5A and 5B of the plaintiffs' complaint relative to roads and electric power poles.