(Slip Opinion)    OCTOBER TERM, 2010    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MONTANA *v.* WYOMING ET AL.

### ON EXCEPTION TO REPORT OF SPECIAL MASTER

No. 137, Orig.   Argued January 10, 2011—Decided May 2, 2011

Article V(A) of the Yellowstone River Compact ratified by Montana, Wyoming, and North Dakota provides: "Appropriative rights to the beneficial uses of the water of the Yellowstone River System existing in each signatory State as of January 1, 1950, shall continue to be enjoyed in accordance with the laws governing the acquisition and use of water under the doctrine of appropriation." 65 Stat. 666. Montana filed a bill of complaint, alleging that Wyoming breached Article V(A) by allowing its upstream pre-1950 water users to switch from flood to sprinkler irrigation, which increases crop consumption of water and decreases the volume of runoff and seepage returning to the river system. Thus, even if Wyoming's pre-1950 users divert the same quantity of water as before, less water reaches downstream users in Montana. Concluding that the Compact permits more efficient irrigation systems so long as the conserved water is used to irrigate the same acreage watered in 1950, the Special Master found that Montana's increased-efficiency allegation failed to state a claim. Montana has filed an exception.

*Held:* Because Article V(A) of the Compact incorporates the ordinary doctrine of appropriation without significant qualification, and because in Wyoming and Montana that doctrine allows appropriators to improve their irrigation systems, even to the detriment of downstream appropriators, Montana's increased-efficiency allegation fails to state a claim for breach of the Compact under Article V(A). Pp. 4–19.

  (a) Background appropriation law principles do not support Montana's position. The doctrine of appropriation provides that rights to water for irrigation are perfected and enforced in order of seniority, starting with the first person to divert water from a natural stream and apply it to a "beneficial use." Once perfected, that water right is

senior to any later appropriators' rights and may be fulfilled entirely before the junior appropriators get any water. However, junior appropriators do acquire rights to the stream basically as it exists when they find it. Under this no-injury rule, junior users may, subject to the fulfillment of the senior users' existing rights, prevent senior users from enlarging their rights to the junior users' detriment. Here, the question is whether a switch to more efficient irrigation with less return flow is within Wyoming's pre-1950 users' existing appropriative rights or is an improper enlargement of that right. Although the law of return flows is an unclear area of appropriation doctrine, the Special Master correctly concluded that Wyoming's pre-1950 users may switch to sprinkler irrigation. Pp. 4–16.

(1) A change in irrigation methods does not appear to run afoul of the no-injury rule in Montana and Wyoming, which generally concerns changes in the location of the diversion and the place or purpose of use. Thus, an appropriator may increase his consumption by changing to a more water-intensive crop so long as he makes no change in acreage irrigated or amount of water diverted. Ordinary, day-to-day operational changes or repairs also do not violate the rule. Consumption can even be increased by adding farm acreage, if that was part of the plan from the start, and diligently pursued through the years. Irrigation system improvements seem to be the same sort of changes. This view is consistent with the fact that by 1950 both States had statutes regulating certain changes to water rights, but neither required farmers to take official action before adjusting irrigation methods. Cases in both States frequently describe the no-injury rule as applying to changes in point of diversion, purpose of use, and place of use. The abundance of litigation over such changes—and the absence of any litigation over the sort of change at issue here—strongly implies that irrigation efficiency improvements were considered within the scope of the original appropriative right. Pp. 8–10.

(2) The doctrine of recapture—which permits an appropriator who has diverted water for irrigation to recapture and reuse his own runoff and seepage before it escapes his control or his property—also supports treating irrigation efficiency improvements as within the original appropriative right. Montana and Wyoming cases appear to apply this basic doctrine without any qualification based on whether the return flow would re-enter the original stream or not. By using sprinklers instead of flood irrigation, Wyoming's pre-1950 water users effectively recapture water. The sprinklers reduce loss from seepage and runoff and are simply different mechanisms for increasing the volume of water available to crops without changing the amount of diversion. Pp. 10–15.

(3) This conclusion is consistent with the view of water law scholars who have considered the question presented in this case. Pp. 15–16.

(b) Also unpersuasive is Montana's argument that, if background appropriation law principles do not support its position, Article V(A)'s "beneficial use" definition nonetheless restricts the scope of pre-1950 appropriative rights to the net volume of water that was actually being consumed in 1950. Pp. 16–19.

(1) "Beneficial use" is "that use by which the water supply of a drainage basin is depleted when usefully employed by the activities of man." 65 Stat. 665. Montana contends that the term means the *amount of* depletion, and thus any activity increasing Wyoming's pre-1950 depletions beyond pre-1950 levels exceeds Article V(A)'s scope. Pp. 16–17.

(2) Nothing in the Compact's definition suggests such an interpretation. A plain reading indicates that "beneficial use" is a *type* of use that depletes the water supply. This view is supported by the circumstances in the signatory States when the Compact was drafted. At that time, Wyoming had a statutory preference for irrigation, a depletive use, over power generation, a nondepletive use. It thus it makes sense for the Compact to protect irrigation uses that were legislatively favored and represented the predominant use of the Yellowstone River system. Montana's reading, by contrast, would drastically redefine the term. The amount of water put to "beneficial use" has never been defined by net water consumption. In irrigation, that amount has always included a measure of necessary loss, *e.g.,* runoff or evaporation. If the Compact's definition were meant to drastically redefine "beneficial use," this Court would expect far more clarity. Moreover, if the Compact effected a dramatic reframing of ordinary appropriation principles, the rest of Article V(A), which expressly states that "the laws governing the acquisition and use of water under the doctrine of appropriation" control, would make little sense. Pp. 17–18.

(3) If Article V(A) were intended to guarantee Montana a set quantity of water, it could have done so plainly, as done in other compacts, *e.g.,* the Colorado River Compact of 1922. Pp. 18–19.

Exception overruled.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, ALITO, and SOTOMAYOR, JJ., joined. SCALIA, J., filed a dissenting opinion. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 137, Orig.

_____

## STATE OF MONTANA, PLAINTIFF *v.* STATE OF WYOMING AND STATE OF NORTH DAKOTA

ON EXCEPTION TO THE REPORT OF THE SPECIAL MASTER

[May 2, 2011]

JUSTICE THOMAS delivered the opinion of the Court.

This case arises out of a dispute between Montana and Wyoming over the Yellowstone River Compact. Montana alleges that Wyoming has breached Article V(A) of the Compact by allowing its pre-1950 water appropriators to increase their net water consumption by improving the efficiency of their irrigation systems. The new systems, Montana alleges, employ sprinklers that reduce the amount of wastewater returned to the river, thus depriving Montana's downstream pre-1950 appropriators of water to which they are entitled. The Special Master has filed a First Interim Report determining, as relevant here, that Montana's allegation fails to state a claim because more efficient irrigation systems are permissible under the Compact so long as the conserved water is used to irrigate the same acreage watered in 1950. We agree with the Special Master and overrule Montana's exception to that conclusion.

I

From its headwaters in Wyoming, the Yellowstone River flows nearly 700 miles northeast into Montana and then North Dakota, where it joins the Missouri River. Several

of its tributaries, including the Clarks Fork, Tongue, Powder, and Bighorn Rivers, also begin in Wyoming and cross into Montana before joining the main stem of the Yellowstone River. This river system's monthly and annual flows, which are dictated largely by snow melt, vary widely. In 1964, for example, the flow in the Tongue and Powder Rivers was nearly 10 times the 1961 flow. App. 936. As the rivers came into heavy use for irrigation, it became expedient to build water storage facilities for preserving the heaviest flows. See First Interim Report of Special Master 6 (hereinafter Report).

Before funding new water storage facilities, Congress sought agreement as to the allocation of the Yellowstone River system among Wyoming, Montana, and North Dakota. In 1932, Congress granted the States permission to negotiate a compact. See Act of June 14, 1932, ch. 253, 47 Stat. 306. Draft compacts were produced in 1935, 1942, and 1944, but none was fully agreed upon. Finally, in 1951 Montana, Wyoming, and North Dakota ratified the Yellowstone River Compact, and Congress consented to it. Act of Oct. 30, 1951, 65 Stat. 663.

The Yellowstone River Compact divides water into three tiers of priority. First, Article V(A) provides: "Appropriative rights to the beneficial uses of the water of the Yellowstone River System existing in each signatory State as of January 1, 1950, shall continue to be enjoyed in accordance with the laws governing the acquisition and use of water under the doctrine of appropriation." *Id.,* at 666. Second, Article V(B) allocates to each State the "quantity of that water as shall be necessary to provide supplemental water supplies" for the pre-1950 uses protected by Article V(A). *Ibid.* Third, "the remainder of the unused and unappropriated water" of each tributary is divided by percentage: Wyoming receives 60% of the remaining water in the Clarks Fork River, 80% in the Bighorn River, 40% in the Tongue River, and 42% in the Powder River; the

rest goes to Montana. *Id.,* at 666–667.

In February 2008, we granted Montana leave to file a bill of complaint against Wyoming for breach of the Compact. 552 U. S. 1175. Montana alleged that Wyoming had breached the Compact by consuming more than its share of the Tongue and Powder Rivers. Bill of Complaint 3, ¶8. Specifically, Montana claimed that Wyoming was appropriating water for a number of new, post-1950 uses: irrigating new acreage; building new storage facilities; conducting new groundwater pumping; and increasing consumption on existing agricultural acreage.[1] *Id.,* at 3–4, ¶¶ 9–12. According to Montana's complaint, the Compact did not permit Wyoming to use water for any of these practices as long as Montana's pre-1950 users' rights remained unfulfilled. *Id.,* at 3, ¶8.

In response, Wyoming filed a motion to dismiss the complaint. We appointed a Special Master and referred the motion to him. 555 U. S. \_\_ (2008). After briefing and argument, the Special Master recommended that we deny Wyoming's motion, because at least some of Montana's allegations state a claim for relief. The Special Master found that "Article V of the Compact protects pre-1950 appropriations in Montana from new surface and ground-water diversions in Wyoming, whether for direct use or for storage, that prevent adequate water from reaching Montana to satisfy those pre-1950 appropriations." Report 14–15. But the Special Master agreed with Wyoming that Montana's allegations regarding "efficiency improvements

_____

[1] Montana has since clarified that increased consumption on existing acreage refers to the use of more efficient irrigation systems. The "efficiency" of irrigation for our purposes refers to the amount of wastewater that is lost, for example, to evaporation, seepage, runoff, or deep percolation. Some of the lost water returns to the river and is later available for downstream users. A more efficient irrigation system loses less water; thus, though it may draw the same volume of water from the river, *net* water consumption is increased.

by pre-1950 appropriators in Wyoming" do not state a
claim for relief. *Id.,* at 15. The States did not object to
most of the Special Master's findings, and we have issued
orders accordingly. See 562 U. S. __ (2010); 562 U. S. __
(2010). Montana has filed an exception to the Special
Master's rejection of its increased-efficiency allegation. It
is this exception that is before us.[2]

## II

Article V(A) of the Compact states that "[a]ppropriative
rights to the beneficial uses of [water] . . . existing in each
signatory State as of January 1, 1950, shall continue to be
enjoyed in accordance with the laws governing the acquisi-
tion and use of water under the doctrine of appropriation."
Montana claims that its pre-1950 appropriators' rights are
not "continu[ing] to be enjoyed" because upstream pre-
1950 appropriators in Wyoming have increased their
consumption by switching from flood to sprinkler irriga-
tion. Montana alleges that sprinkler systems increase
crop consumption of water and decrease the volume of
runoff and seepage that returns to the Tongue and Powder
rivers by 25% or more.[3] See Montana's Exception and
Brief 3 (hereinafter Brief for Montana). As a result, even
if Wyoming's pre-1950 water users divert the same quan-
tity of water as before, less water reaches Montana. Ac-
cording to Montana, Article V(A) prohibits Wyoming from
allowing this practice when it deprives Montana's pre-

—————

[2] Montana also raised an exception to the Special Master's finding
that if Montana can remedy the shortage of water to its pre-1950 users
by curtailing its post-1950 uses without "prejudic[ing] Montana's other
rights under the Compact," then an intrastate remedy is "the appropri-
ate solution." Report 15. We recommitted this exception to the Special
Master. 562 U. S. __ (2010).

[3] For purposes of resolving Wyoming's motion to dismiss, we take as
true Montana's allegation that the new sprinkler systems actually
reduce return flow to the rivers. Wyoming has not conceded that this is
true. See Wyoming's Reply to Montana's Exception 35, n. 6.

1950 users of their full water rights.

The question, therefore, is whether Article V(A) allows Wyoming's pre-1950 water users—diverting the same quantity of water for the same irrigation purpose and acreage as before 1950—to increase their consumption of water by improving their irrigation systems even if it reduces the flow of water to Montana's pre-1950 users. Montana makes two basic arguments: that background principles of appropriation law, to the extent they are incorporated into the Compact, do not allow such an increase in consumption; and that even if they do, the terms of the Compact amended those principles in Montana's favor. The Special Master rejected these arguments, and so do we.

A

Because Article V(A) of the Compact protects "[a]ppropriative rights to the beneficial uses of [water]" as of 1950 "in accordance with the laws governing the acquisition and use of water under the doctrine of appropriation," we begin with an overview of appropriation doctrine.[4] As the Special Master explained, if "[a]ppropriation law clearly proscribe[s] increases in consumption on existing acreage to the detriment of downstream appropriators, the Compact arguably would prohibit Wyoming from allowing its appropriators to make

––––––––––

[4] As with all contracts, we interpret the Compact according to the intent of the parties, here the signatory States. We thus look primarily to the doctrine of appropriation in Wyoming and Montana, but, like the States, we also look to Western water law more generally and authorities from before and after 1950. The States appear to have assumed that the doctrine has not changed in a way directly relevant here. We therefore do not decide whether Article V(A) intended to freeze appropriation law as it stood in 1949, or whether it incorporates the evolution of the doctrine over time, allowing Compact-protected rights to grow or shrink accordingly. We resolve the matter of Montana's exception without prejudice to that issue. See Report 39–40.

such increases to the detriment of Montana's pre-1950 uses." Report 65.

As is typical west of the 100th meridian, the doctrine of appropriation has governed water rights in Montana and Wyoming since the 1800's. See, *e.g., Basey* v. *Gallagher*, 20 Wall. 670, 683 (1875). As relevant here, the doctrine provides that rights to water for irrigation are perfected and enforced in order of seniority, starting with the first person to divert water from a natural stream and apply it to a beneficial use (or to begin such a project, if diligently completed). See *Hinderlider* v. *La Plata River & Cherry Creek Ditch Co.*, 304 U. S. 92, 98 (1938); *Arizona* v. *California*, 298 U. S. 558, 565–566 (1936); Wyo. Const., Art. 8, §3 ("Priority of appropriation for beneficial uses shall give the better right"). The scope of the right is limited by the concept of "beneficial use." That concept restricts a farmer "to the amount of water that is necessary to irrigate his land by making a reasonable use of the water." 1 C. Kinney, Law of Irrigation and Water Rights §586, pp. 1007–1008 (2d ed. 1912) (hereinafter Kinney) (internal quotation marks omitted); see also *Bailey* v. *Tintinger*, 45 Mont. 154, 176–178, 122 P. 575, 583 (1912); *Quinn* v. *John Whitaker Ranch Co.*, 54 Wyo. 367, 376–380, 92 P. 2d 568, 570–571 (1939). Once such a water right is perfected, it is senior to any later appropriators' rights and may be fulfilled entirely before those junior appropriators get any water at all.

For our purposes, Montana's pre-1950 water users are similar to junior appropriators. As between the States, the Compact assigned the same seniority level to all pre-1950 water users in Montana and Wyoming. See Brief for Montana 23; Brief for United States as *Amicus Curiae* 12. But as Montana concedes, precisely because of this equal seniority, its downstream pre-1950 users cannot stop Wyoming's upstream pre-1950 users from fully exercising their water rights. Thus, when the rivers are low, Mon-

tana's downstream pre-1950 users might get no water at all because the equally senior users upstream in Wyoming may lawfully consume all of the water. Tr. of Oral Arg. 51.

Junior appropriators are not completely without rights, however. As they come online, appropriators acquire rights to the stream basically as it exists when they find it. See 2 Kinney §803, at 1403–1404. Accordingly, subject to the fulfillment of all senior users' existing rights, under the no-injury rule junior users can prevent senior users from enlarging their rights to the junior users' detriment. 1 W. Hutchins, Water Rights Laws in the Nineteen Western States 573 (1971) (hereinafter Hutchins).

Montana's pre-1950 users can therefore "insist that [Wyoming's pre-1950 users] confine themselves strictly within the rights which the law gives them, that is, to the amount of water within the extent of their appropriation which they actually apply to some beneficial use." 2 Kinney §784, at 1366. That general proposition is undisputed; the dispute here is in its application. Is a switch to more efficient irrigation with less return flow within the extent of Wyoming's pre-1950 users' existing appropriative rights, or is it an improper enlargement of that right to the detriment of Montana's pre-1950 water users?

As the Special Master observed, the law of return flows is an unclear area of appropriation doctrine. Report 65 (citing Trelease, Reclamation Water Rights, 32 Rocky Mt. L. Rev. 464, 469 (1960)). The States have not directed us to any case on all fours with this one. Indeed, "[n]o western state court appears to have conclusively answered the question." Report 65.

Despite the lack of clarity, the Special Master found several reasons to conclude that Wyoming's pre-1950 users may switch to sprinkler irrigation. He found that the scope of the original appropriative right includes such a change so long as no additional water is diverted from the

stream and the conserved water is used on the same acre-age for the same agricultural purpose as before. We agree with the Special Master.[5]

1

First, although the no-injury rule prevents appropria-tors from making certain water-right changes that would harm other appropriators, a change in irrigation methods does not appear to run afoul of that rule in Montana and Wyoming. See *id.,* at 69. Because each new appropriator is entitled to the stream as it exists when he finds it, the general rule is that "if a change in these conditions is made by [a senior] appropriator, which interferes with the flow of the water to the material injury of [the junior appropriator's] rights, he may justly complain." 2 Kinney §803, at 1404.

But the no-injury rule is not absolute; it generally con-cerns changes in the location of the diversion and the place or purpose of use. *Quigley* v. *McIntosh*, 110 Mont.

─────────

[5]The lack of clarity in this area of water law highlights the sensitive nature of our inquiry and counsels caution. Our original jurisdiction over cases between States brings us this dispute between Montana and Wyoming about the meaning of their congressionally approved Yellow-stone River Compact. See U. S. Const., Art. III, §2, cl. 2; 28 U. S. C. §1251(a). Yet, because the Compact references and the parties direct us to principles of appropriation doctrine, we find ourselves immersed in state water law. See n. 4, *supra.* Our assessment of the scope of these water rights is merely a federal court's description of state law.

The highest court of each State, of course, remains "the final arbiter of what is state law." *West* v. *American Telephone & Telegraph Co.*, 311 U. S. 223, 236 (1940). We recognize that appropriation doctrine contin-ues to evolve, and there are reasonable policy arguments in favor of both States' positions here. But it is not this Court's role to guide the development of state water regulation. See *id.*, at 237 ("[I]t is the duty of [federal courts] in every case to ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of 'general law'"). Our decision is not intended to restrict the States' determina-tion of their respective appropriation doctrines.

495, 505, 103 P. 2d 1067, 1072 (1940) ("[P]lace of diver-sion, or place or purpose of use, may be changed only if others are not thereby injured" (internal quotation marks omitted)); see also 1 S. Wiel, Water Rights in the Western States §498, p. 532 (3d ed. 1911) (hereinafter Wiel); Mont. Code Ann. §89–803 (1947); Wyo. Stat. Ann. §41–3–104 (1977). Accordingly, certain types of changes can occur even though they may harm downstream appropriators. See D. Getches, Water Law in a Nutshell 175 (4th ed. 2009) (hereinafter Getches). For instance, an appropriator may increase his consumption by changing to a more water-intensive crop so long as he makes no change in acreage irrigated or amount of water diverted. See *id.,* at 183; *East Bench Irrig. Co.* v. *Deseret Irrig. Co.*, 2 Utah 2d 170, 179, 271 P. 2d 449, 455 (1954) (assuming that farm-ers may "legally increase the quantity of water consumed in irrigating their lands by changing to more water con-suming crops" and adding that "it would be difficult to prevent . . . such increased consumptive use"). Ordinary, day-to-day operational changes or repairs also do not violate the no-injury rule. See, *e.g.*, 1 Wiel §56, at 51 ("Would the fact that my pump has for years dripped water onto a neighbor's ground give him a right to say that my pump must go on leaking?"). Consumption can even be increased by adding farm acreage, so long as that was part of the plan from the start, and diligently pursued through the years. See *Van Tassel Real Estate & Live Stock Co.* v. *Cheyenne*, 49 Wyo. 333, 357–359, 54 P. 2d 906, 913 (1936) *(per curiam);* 1 Hutchins 377–378; *St. Onge* v. *Blakely*, 76 Mont. 1, 22–24, 245 P. 532, 539 (1926).

Improvements to irrigation systems seem to be the sort of changes that fall outside the no-injury rule as it exists in Montana and Wyoming. Those changes are not to the "place of diversion, or place or purpose of use," *Quigley*, *supra,* at 505, 103 P. 2d, at 1072, and thus seem to be excluded, much like crop changes or day-to-day irrigation

adjustments or repairs. This is also consistent with the
fact that by 1950 both States had statutes regulating
certain changes to water rights, but neither required
farmers to take official action before adjusting irrigation
methods.[6]  See Report 69–70, 87; *id.,* at 69 (they "do not
generally have procedures for overseeing changes in water
efficiencies stemming from crop shifts or irrigation im-
provements where there are no formal changes in the
underlying water rights").  Like the Special Master, we
find this to be persuasive evidence that the States consid-
ered such changes permissible.

Montana argues that, regardless of the statutes, private
lawsuits could be brought to challenge such efficiency
changes.  But it has not provided a single example from
either State.  Instead, Montana and Wyoming cases typi-
cally describe the no-injury rule as applying to changes in
point of diversion, purpose of use, and place of use.  See,
*e.g., Maclay* v. *Missoula Irrig. Dist.*, 90 Mont. 344, 355–
357, 3 P. 2d 286, 291 (1931); *Thayer* v. *Rawlins*, 594 P. 2d
951, 955 (Wyo. 1979).  The abundance of litigation over
such changes—and the absence of any litigation over the
sort of change at issue here—strongly implies that irriga-
tion efficiency improvements do not violate the no-injury
rule and were considered within the scope of the original
appropriative right.

2

The doctrine of recapture also supports treating im-
provements in irrigation efficiency as within the original
appropriative right.  Under this doctrine, an appropriator
who has diverted water for irrigation purposes has the
right to recapture and reuse his own runoff and seepage

───────────

[6]Mont. Code Ann. §89–803 (1947); Wyo. Stat. Ann. §71–401 (1945)
(water rights "cannot be detached from the lands, place or purpose for
which they are acquired" outside of specific exceptions); see also 1885
Mont. Laws p. 131, §3.

water before it escapes his control or his property.[7]  An appropriator is entitled to the "exclusive control [of his appropriated water] so long as he is able and willing to apply it to beneficial uses, and such right extends to what is commonly known as wastage from surface run-off and deep percolation, necessarily incident to practical irriga- tion." *Ide* v. *United States,* 263 U. S. 497, 506 (1924) (internal quotation marks omitted); see also *Arizona Pub. Serv. Co.* v. *Long*, 160 Ariz. 429, 437–438, 773 P. 2d 988, 996–997 (1989) ("No appropriator can compel any other appropriator to continue the waste of water which benefits the former.  If the senior appropriator, through scientific and technical advances, can utilize his water so that none is wasted, no other appropriator can complain").

Montana contends that this rule does not apply when the runoff or seepage water would, if not recaptured, return to the same stream from which it was originally drawn.  There is some support for Montana's position— that a beneficial user may not reuse water at all, even while it is still on his property, if it otherwise would flow back to the same stream—especially in Utah and Colorado cases.  See *Deseret Irrig. Co.*, *supra,* at 180–182, 271 P. 2d, at 456–457; *Estate of Steed* v. *New Escalante Irrig. Co.*, 846 P. 2d 1223, 1226 (Utah 1992); *Comstock* v. *Ramsay*, 55 Colo. 244, 252–258, 133 P. 1107, 1110–1111 (1913).[8]  But other authorities draw no such exception based on where the runoff or seepage is heading.  See 2 Hutchins 580–582

———————

[7] And in some narrowly defined circumstances, he retains this right even after the water leaves his property.  See 1 Wiel §§38–40, at 37–43.

[8] Colorado has a relatively unique doctrine of recapture.  See Hoese, Comment, Recapture of Reclamation Project Ground Water, 53 Cal. L. Rev. 541, 544, n. 18 (1965) (noting the general doctrine of recapture, and adding that "[t]he Colorado rule, however, is to the contrary"); *United States* v. *Tilley*, 124 F. 2d 850, 858 (CA8 1941) (allowing recap- ture by the original appropriator under Nebraska law, and noting Colorado's opposite rule).

(asserting that, even in Utah, "where the original appro-
priator retains possession and control of the waste and
seepage water from irrigation of his lands, he is entitled to
reuse these waters for his own benefit and need not return
them *to the channel from which they were diverted*" (em-
phasis added)); Getches 139–145; *Woolman* v. *Garringer*, 1
Mont. 535 (1872).  And Montana cites no case from either
State here in which a court has recognized, much less
found controlling, the idea that a water user may not
reuse his own wastewater while it is still on his property
simply because it otherwise would return to the original
stream.

   In fact, Montana and Wyoming appear to apply, without
qualification, the basic doctrine that the original appro-
priator may freely recapture his used water while it re-
mains on his property and reuse it for the same purpose
on the same land.  For example, in *Binning* v. *Miller*, 55
Wyo. 451, 102 P. 2d 54 (1940), a man was diverting water
from a creek fed largely by irrigation runoff and seepage
from Binning's property.  Although the court found that
the man had a right to that water once Binning's runoff
and seepage had become a natural stream, it noted that
his right remained subject to Binning's right "to use the
water above mentioned for beneficial purposes upon the
land for which the seepage water was [originally] appro-
priated." *Id.,* at 477, 102 P. 2d, at 63.  In a later case, the
court explained that the man could not "secure a perma-
nent right to continue to receive the water" because
Binning "might find better ways of utilizing the water on
the same land so that less waste and seepage would oc-
cur." *Bower* v. *Big Horn Canal Assn.*, 77 Wyo. 80, 101, 307
P. 2d 593, 601 (1957).

   Similarly, in *Bower* v. *Big Horn Canal Assn.*, the court
held that Bower could appropriate water as it seeped
across his property from the Big Horn Canal toward a
nearby river. *Id.,* at 102–104, 307 P. 2d, at 602.  The court

added, however, that Bower's right was subject always to the Big Horn Canal's right: "No appropriator can compel any other appropriator to continue the waste of water which benefits the former." *Id.,* at 101, 307 P. 2d, at 601. Importantly, the court noted that "[i]f the senior appropriator by a different method of irrigation can so utilize his water that it is all consumed in transpiration and consumptive use and no waste water returns by seepage or percolation to the river, no other appropriator can complain." *Ibid.*

Finally, in *Fuss* v. *Franks,* 610 P. 2d 17 (Wyo. 1980), water was seeping from Fuss' property and into a pit in a public right of way. Franks was the first to appropriate the water from the pit. The court upheld Franks' appropriation right because the water had already escaped from Fuss' property. The court said that the "owner of land upon which seepage or waste water rises has the right to use and reuse—capture and recapture—such waste waters," but only before the water escapes his land, and "for use only upon the land for which the water forming the seepage was originally appropriated." *Id.,* at 20 (internal quotation marks omitted). Fuss thus had no superior right to the water that had left his property, and especially not for reuse on other lands.

The law in Montana is similar. The Montana Supreme Court has explained that "the general rule . . . is that the owner of the right to use the water—his private property while in his possession,—may collect it, recapture it, before it leaves his possession." *Rock Creek Ditch & Flume Co.* v. *Miller,* 93 Mont. 248, 268, 17 P. 2d 1074, 1080 (1933); see also A. Stone, Montana Water Law 66 (1994) (noting that, according to the "early cases," while "the water is still seeping and running off one's own land, the landowner is free to recapture and further use it").

The right of recapture discussed in these authorities is broad. As the Special Master recognized, the "language of

the Wyoming Supreme Court . . . was expansive" in *Binning*, *Bower*, and *Fuss*, and "all appear to hold that an appropriator in Wyoming can increase his water use efficiency by recovering runoff on his property or through other means so long as the increased consumption is on the same land to which the appropriative right attaches." Report 81; see also *id.,* at 78–85; Thompson, Case Note, Water Law—Reusing Irrigation Waste Water on Different Lands: A Warning to Get a New Permit, Fuss v. Franks, 610 P. 2d 17 (Wyo. 1980), 16 Land & Water L. Rev. 71, 76 (1981) (concluding that in Wyoming, "a prior appropriator can at anytime, utilize irrigation methods that are totally consumptive, such as pumping the collected waste water back to the top of the field or installing a sprinkler system, thereby eliminating all waste of water"); Jones, Note, Rights of the Original Appropriator to Recapture Water Used in Irrigation, 11 Wyo. L. J. 39 (1956); Wille, Note, The Right to Use Waste Water Before It Re-enters the Stream, 12 Wyo. L. J. 47, 48 (1957).

The Wyoming and Montana doctrine of recapture strongly suggests that improvements in irrigation efficiency are within the original appropriative right of Wyoming's pre-1950 water users. By using sprinklers rather than flood irrigation, those water users effectively recapture water. The sprinklers, by reducing loss due to seepage and runoff, operate much like, if more efficiently than, cruder recapture systems involving ditches or pits. They are simply different mechanisms for increasing the volume of water available to the crops without changing the amount of diversion. *Binning*, *Bower,* and *Fuss* expressly acknowledged that in such situations, lower appropriators who have perfected their own appropriative rights are nonetheless at the mercy of the property owners from which their water flows. See 55 Wyo., at 474–477, 102 P. 2d, at 63; 77 Wyo., at 100–104, 307 P. 2d, at 601–602; 610 P. 2d, at 20.

3

Our conclusion is consistent with that of water law scholars who have considered the specific question presented in this case. One scholar asserted: "[O]f course, increasing efficiency at one site may reduce the amount of water available to downstream users who may rely on return flows from other users. [Wyoming] law, however, does not preclude more efficient uses merely because a downstream user may be injured." Squillace, A Critical Look at Wyoming Water Law, 24 Land & Water L. Rev. 307, 331 (1989); see *id.*, at 331, n. 156 ("For example, a farmer who traditionally consumes only 50% of the water applied to his land is free to change his crop or method of applying water so as to increase his consumption to 60%"); see also Thompson, *supra,* at 76 ("[A] prior appropriator can at anytime . . . instal[l] a sprinkler system, thereby eliminating all waste of water"). And a national hornbook on water law has observed:

"The rule allowing recapture and reuse of salvaged water on the original land can result in more water being consumed. For instance, if a water user is consuming less than the permitted amount of water and plants a more water-intensive crop or puts in a more efficient irrigation system, most or all of the water that had previously been returned to the stream might be consumed. This can deprive other appropriators of water on which they depend but it is allowed since it is technically within the terms of the original appropriation." Getches 143–144.

Montana has not identified any scholars who have reached the opposite conclusion.

For all of these reasons, we hold that the doctrine of appropriation in Wyoming and Montana allows appropriators to improve their irrigation systems, even to the detriment of downstream appropriators. We readily ac-

knowledge that this area of law is far from clear. See
*supra*, at 7. But the apparent scope of the no-injury rule
in Wyoming and Montana, the doctrine of recapture and
its broad reach in Wyoming and Montana case law, and
the specific conclusions of water law scholars all point in
the same direction, which also comports with the Special
Master's exhaustive discussion and findings. Accordingly,
if Article V(A) simply incorporates background principles
of appropriation law, it allows Wyoming's pre-1950 water
users to improve their irrigation efficiency, even to the
detriment of Montana's pre-1950 users.

## B

Montana, however, takes another tack. It argues that
even if background principles of appropriation law do not
support its position, Article V(A) of the Compact does not
protect the full scope of ordinary appropriative rights.
Montana claims that the Compact's definition of "benefi-
cial use" restricts the scope of protected pre-1950 appro-
priative rights to the net volume of water that was actu-
ally being consumed in 1950. We agree with the Special
Master that this argument also fails.

### 1

Article V(A) protects "[a]ppropriative rights to the bene-
ficial uses of . . . water." "Beneficial use," in turn, is de-
fined in Article II(H) as "that use by which the water
supply of a drainage basin is depleted when usefully em-
ployed by the activities of man." 65 Stat. 665. Montana
contends that "beneficial use" is thus defined as the
*amount of* depletion. According to Montana, any activity
that increases pre-1950 water users' depletions in Wyo-
ming beyond pre-1950 levels exceeds the scope of the
appropriative rights that Article V(A) protects. See Brief
for Montana 25–28. On this basis, Montana asserts that
the Compact requires (subject to river conditions) that the

same quantity of water that was reaching Montana as of January 1, 1950, continue to do so. *Id.*, at 26.

2

We acknowledge that "beneficial use" refers to a type of use that involves some depletion, as all irrigation does. See Report 61. The part of the Compact's definition of "beneficial use" that refers to depletion—"that use by which the water supply . . . is depleted"—is fairly clear. It begins with "that use," and the words that follow merely explain that "that use" must be a use that "deplete[s]" the "water supply." Nothing in the language suggests that "beneficial use" means a measure of the *amount* of water depleted. A "beneficial use" within the meaning of the Compact, therefore, is a *type* of use that depletes the water supply.

This plain reading makes sense in light of the circumstances existing in the signatory States when the Compact was drafted. At that time, Wyoming had a statutory preference for irrigation, a type of depletive use, over power generation, a nondepletive use. Wyo. Stat. Ann. §71–402 (1945). It makes sense that the Compact would have been written to protect the irrigation uses that were legislatively favored and represented the predominant use of the Yellowstone River system. See Tr. of Oral Arg. 45–47; 65 Stat. 663 (Compact Preamble) (noting that the Compact recognizes "the great importance of water for irrigation in the signatory States").

Montana's reading of the Compact, by contrast, does not follow from the text and would drastically redefine the term "beneficial use" from its longstanding meaning. The amount of water put to "beneficial use" has never been defined by net water consumption. The quantity of water "beneficially used" in irrigation, for example, has always included some measure of necessary loss such as runoff, evaporation, deep percolation, leakage, and seepage (re-

gardless of whether any of it returns to the stream). So, water put to "[b]eneficial use is not what is actually consumed, but what is actually necessary in good faith." 1 Wiel §481, at 509; see also Trelease, The Concept of Reasonable Beneficial Use in the Law of Surface Streams, 12 Wyo. L. J. 1, 10 (1957) (listing irrigation as a beneficial use and noting that "the method of application, by flooding, channeling, or sprinkling, is immaterial"); J. Sax, B. Thompson, J. Leshy, & R. Adams, Legal Control of Water Resources 131 (4th ed. 2006) (discussing normal irrigation practices and observing that the amount of water put to beneficial use "is often considerably more than the quantum actually consumed").

If the Compact's definition of "beneficial use" were meant to drastically redefine the term into shorthand for net water consumption, we would expect far more clarity. For example, the Compact could have stated that it would protect "only 'the amount of water *consumed* for a beneficial use in each signatory state as of January 1, 1950.'" Report 60. Or it could have defined "beneficial use" as the "*volume* by which the water supply . . . is depleted." Moreover, if the Compact effected a dramatic reframing of ordinary appropriation principles, the rest of Article V(A), which expressly states that "the laws governing the acquisition and use of water under the doctrine of appropriation" control, would make little sense.

We agree with the Special Master that the definition of beneficial use in the Compact is unremarkable. Article V(A) does not change the scope of the pre-1950 appropriative rights that it protects in both States.

### 3

Finally, if Article V(A) were intended to guarantee Montana a set quantity of water, it could have done so as plainly as other compacts that do just that. By 1950, Wyoming itself had entered into at least one compact that

defined water rights in terms of depletion. The Colorado River Compact of 1922 apportioned 7,500,000 acre-feet of water per year for "the exclusive beneficial consumptive use" of several upstream States, including Wyoming. That compact specifically added that "[t]he States of the Upper Division will not cause the flow of the river at Lee Ferry to be depleted below an aggregate of 75,000,000 acre feet for any period of ten consecutive years . . . ." National Resources Planning Bd., Water Resources Comm., Interstate Water Compacts, 1785–1941, p. 8 (1942). See also Republican River Compact (1943), Kan. Stat. Ann. §82a–518 (1997) (allocating water by the acre-foot for beneficial consumptive use in Kansas, Nebraska, and Colorado). And, even here in the Yellowstone River Compact, Article V(B) unambiguously apportions the third tier of Yellowstone River system water by percentage. 65 Stat. 666. The notion that Article V(A) accomplishes essentially the same sort of depletive allocation with language that has a different and longstanding meaning is simply unpersuasive.

*    *    *

We conclude that the plain terms of the Compact protect ordinary "[a]ppropriative rights to the beneficial uses of [water] . . . existing in each signatory State as of January 1, 1950." Art. V(A), *ibid.* And the best evidence we have shows that the doctrine of appropriation in Wyoming and Montana allows appropriators to improve the efficiency of their irrigation systems, even to the detriment of downstream appropriators. Montana's allegation that Wyoming has breached Article V(A) of the Compact by allowing its pre-1950 water users to increase their irrigation efficiency thus fails to state a claim. Accordingly, Montana's first exception to the Special Master's First Interim Report is overruled.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

No. 137, Orig.

## STATE OF MONTANA, PLAINTIFF *v.* STATE OF WYOMING AND STATE OF NORTH DAKOTA

ON EXCEPTIONS TO THE REPORT OF THE SPECIAL MASTER

[May 2, 2011]

JUSTICE SCALIA, dissenting.

Thanks to improved irrigation techniques, Wyoming's farmers and cattlemen appear to consume more of the water they divert from the Yellowstone River and its tributaries today than they did 60 years ago—that is to say, less of the diverted water ultimately finds its way back into the Yellowstone. The Court interprets the Yellowstone River Compact (Compact), see Act of Oct. 30, 1951, ch. 629, 65 Stat. 663, to grant those Wyomans* the right to increase their consumption so long as they do not increase the volume of water they diverted beyond pre-1950 levels. Thus, it holds, Montana cannot complain that the increased consumption interferes with its residents' pre-1950 appropriative water rights. I disagree because the Court's analysis substitutes its none-too-confident reading of the common law, see *ante*, at 7–8, and n. 5, for the Compact's definition of "beneficial use."

The doctrine of appropriation allocates perpetual water rights along a river, on a "first in time[,] . . . superior in right" basis, *Wyoming* v. *Colorado*, 259 U. S. 419, 459 (1922), to those who divert its flow and apply the water to a beneficial use. See *Hinderlider* v. *La Plata River &*

---

　*The dictionary-approved term is "Wyomingite," which is also the name of a type of lava, see Webster's New International Dictionary 2961 (2d ed. 1957). I believe the people of Wyoming deserve better.

*Cherry Creek Ditch Co.*, 304 U. S. 92, 98 (1938). The "beneficial use" requirement does most of the legal work. It marks the types of uses that confer an appropriative right—irrigation being a paradigmatic example, see *United States* v. *Willow River Power Co.*, 324 U. S. 499, 504, n. 2 (1945); and it "measure[s]" the extent of an appropriator's claim, see *Ide* v. *United States*, 263 U. S. 497, 505 (1924); A. Tarlock, Law of Water Rights and Resources §§5:66, 5:68–5:69, pp. 5–130.3, 5–130.9 to 5–130.10 (2010). At common law, an appropriator claims the volume of water diverted and "reasonably required" by his intended use. *Id.,* §§5:65–5:66, at 5–127, 5–130.2; see *Quinn* v. *John Whitaker Ranch Co.*, 54 Wyo. 367, 377–378, 92 P. 2d 568, 570–571 (1939).

The Compact borrows the concept of appropriation to define the rights of pre-1950 water users along the Yellowstone River and its tributaries. Article V(A) promises that "[a]ppropriative rights to the beneficial uses of the water of the Yellowstone River System existing in each signatory State as of January 1, 1950, shall continue to be enjoyed in accordance with the laws governing the acquisition and use of water under the doctrine of appropriation." 65 Stat. 666. Article II(H) elaborates that a "Beneficial Use" is one "by which the water supply of a drainage basin is *depleted* when usefully employed by the activities of man." *Id.*, at 665 (emphasis added).

Like the common law, this definition lays out the types of uses that qualify as beneficial and the volume of water an appropriator may claim through his beneficial use. But the Compact's focus on whether a use *depletes* a river's water supply—not whether it *diverts* the river's flow—significantly limits the volume of water to which Wyoming is entitled. For purposes of the Compact, Wyoming may lay claim only to its beneficial users' net consumption of water, that is, the volume of water diverted from the river minus the volume that flows (or seeps) back into the

river's channel.

This interpretation, and only this interpretation, gives meaning to the definition's use of the word "depleted." I cannot write off as an accident the choice of this word rather than the word consistently used elsewhere in the Compact: "diverted." See *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 711, n. 9 (2004). The Compact's authors knew how to use "diverted" and "diversion" when they wanted to. Those two words appear repeatedly in other provisions of the Compact, see Arts. II(G); V(B), (C); VII(A), (C), (D), 65 Stat. 665–668; and the Compact defines them in the sentence immediately preceding the definition of "beneficial use." See Art. II(G), *id.*, at 665. But the Compact's authors chose to define beneficial use in terms of *depletion*—the first and only time the Compact uses any derivative of the word "deplete." It is in my view a clear indication that the Compact intends to break from the common law's focus on diversion.

The Court reduces the Compact's deliberate use of "depleted" to an inconsequential slip of the pen. According to today's majority, Article II(H) speaks only to the types of uses that confer appropriative rights. "Nothing in the language," it says, "suggests that 'beneficial use' means a measure of the *amount* of water depleted." *Ante*, at 17. This is incomprehensible. On the Court's *own* interpretation "beneficial use" not only defines the types of uses that confer appropriative rights, but also determines the volume of water to which the rights attach—viz., *only* that volume put to one of the specified types of uses. The only question before us is whether "beneficial use" measures the volume *diverted* or the volume *depleted*—and the language of the Compact makes that clear.

The Court provides no plausible explanation for use of the word "depleted" instead of "diverted." Its best effort is the suggestion that the word was used to ensure that hydroelectric power generation and other disfavored,

nondepletive uses do not confer appropriative rights. See *ibid.* That is highly unlikely, for two reasons. First, relying on a subtle distinction between depletion and diversion would be one of the clumsiest ways imaginable to accomplish that simple goal, if it was not already accomplished by other provisions of the Compact. One would instead have expected the Compact simply to exclude the disfavored uses from the "usefu[l] . . . activities of man," Art. II(H), 65 Stat. 665, which confer appropriative rights. Cf. Mont. Code Ann. §85–2–102(4) (2009) (listing types of beneficial uses). Second, and even more conclusively, hydroelectric generation, water wheels, and mill races—the allegedly disfavored uses Wyoming and the United States offer up to explain the word "depleted"—are already excluded from appropriative rights (and probably from any need for appropriative rights) by the Compact's definition of diversion: "the taking or removing of water from the Yellowstone River or any tributary thereof when the water so taken or removed is not returned directly into the channel of the Yellowstone River or of the tributary from which it is taken." Art. II(G), 65 Stat. 665. The modifying clause seems specifically designed to exclude hydroelectric dams, water wheels and mill races, which, when they divert water from the Yellowstone or its tributaries, "retur[n it] directly into the channel . . . from which it is taken."

The Court objects to my interpretation because the word "depleted" lacks the "clarity" necessary to "drastically redefine the term 'beneficial use' from its longstanding meaning," *ante*, at 17. According to the Court, "[t]he amount of water put to 'beneficial use' has never been defined by net water consumption." *Ibid.* Before making this statement, the Court has spent some 10 pages, *ante*, at 7–16, conducting a "sensitive . . . inquiry [that] counsels caution"; into a field (state water law) where the answer of this Court is not conclusive and hence not *ipso facto* cor-

rect ("it is not this Court's role to guide"); resulting in the Court's best guess concerning "an unclear area of appropriation doctrine"; answering a question which "'[n]o western state court [not even a lower court] appears to have conclusively answered.'" *Ante*, at 7–8, and n. 5. The Court calls that hitherto unanswered question "the law of return flows," *ante*, at 7, but it can more accurately be described as the question whether the volume of water to which an appropriator acquires rights is the entire volume diverted for a beneficial use, or rather only the volume depleted by the beneficial use. Which is to say that "beneficial use" has never had the "longstanding meaning" the Court posits. If it has in the past been assumed to refer to all water diverted from the stream rather than all water depleted from the stream, that is only because the issue of which of the two it means has never arisen. I find it quite extraordinary that the Court should expend such heroic efforts (imagine how many cases had to be read!) answering a state water-law question that *no* court of *any* Western State has *ever* answered—a question that would cross a Rabbi's eyes—when the text in front of us provides the clear answer insofar as this Compact is concerned: "depleted."

The Court suggests that if the Compact's authors wanted to break from (what it considers) the common law, they should have defined beneficial use as the "*volume* by which the water supply . . . is depleted." *Ante*, at 18 (internal quotation marks omitted). That objection seems to me to have little force when the Court cannot explain what work "depleted" is supposed to do other than indicate precisely the same concept more concisely. And the Court's helpful drafting tip proves that speaking with greater clarity is not so easy. Following the Court's advice would make nonsense of Article V(B) of the Compact. That provision allocates a fixed percentage "of the unused and unappropriated water" of various tributaries to each

State for post-1950 "storage or direct diversions for benefi-
cial use on new lands or for other purposes."  65 Stat. 666.
But if "beneficial use" in this last phrase means "*the vol-
ume of water* by which . . . the water supply is depleted,"
the provision makes no sense.  It would allocate a fixed
percentage of unused and unappropriated water for "a
volume of water by which the water supply is depleted."  It
makes perfect sense, of course, if "beneficial use" means all
uses that deplete the stream.

   The Court also wonders why, "if Article V(A) were in-
tended to guarantee Montana a set quantity of water," it
did not "d[o] so as plainly as other" interstate water com-
pacts "that do just that."  *Ante*, at 18.  This is a straw man.
Montana does *not* demand a precise volume of water each
year; nor does it insist that its pre-1950 water users al-
ways receive enough water to satisfy their pre-1950 needs.
It merely asks that its pre-1950 water users occupy the
same position relative to Wyoming's pre-1950 users in
2011 as they did in 1950—that whatever would have
flowed back into the Yellowstone after Wyoming appro-
priators' beneficial uses in 1950 if the river then had this
year's flow, will also flow back this year.  See Tr. of Oral
Arg. 13, 16, 24.  In dry years, that may mean some Mon-
tanans will have to make do with less or go without.

   Because I think the Court's disposition disregards the
text of the Compact, I respectfully dissent.